[No. 24031-2-III.  Division Three.  April 17, 2007.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES VINCENT ADAMS, *Appellant*.

38

*Donald G. Miller*, for appellant.

*Steven J. Tucker, Prosecuting Attorney*, and *Kevin M. Korsmo, Deputy*, for respondent.

¶1 KULIK, J. — James Adams was convicted for the crime of homicide by abuse in the death of his infant son. On appeal, Mr. Adams asserts that his initial statements to police were coerced. He also claims that these statements occurred during the functional equivalent of a custodial interrogation and that police should have given Mr. Adams his *Miranda*[1] warnings before asking him any questions. Based on this assertion of initial illegality, Mr. Adams argues that his statements given after he received his rights should have been suppressed by the trial court.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶2 This court reviews a trial court's findings of fact denying a motion to suppress for substantial evidence. Here, Mr. Adams was not in custody because he was able to stop talking with police and meet with his girl friend. Substantial evidence supports the trial court's findings. We, therefore, affirm the conviction for homicide by abuse.

## FACTS

¶3 In the morning hours of May 18, 2004, Jenny Rowe called 911 to report that her infant son, Cadyn, was not breathing. Cadyn was 11 weeks old at the time. Cadyn was the child of Ms. Rowe and her live-in boyfriend, James Adams.

¶4 Paramedics were called to the residence. They attempted to resuscitate Cadyn and placed the infant on a heart monitor. While the paramedics worked on Cadyn, Mr. Adams was seated nearby on the couch. Mr. Adams kept repeating that he did not do anything and that it was not his fault. One of the emergency responders also heard Mr. Adams say that he " 'didn't do anything this time' " and that he " 'just wanted [Cadyn] to be quiet.' " Report of Proceedings at 158.

¶5 Mr. Adams explained to the paramedics that he was taking care of Cadyn. He changed the baby's diaper that morning and put him back to bed. According to Mr. Adams, he returned to check on Cadyn after fixing breakfast for his daughter. Cadyn was not breathing.

¶6 At the hospital, Cadyn showed signs of significant oxygen deprivation. X-rays of his skull showed fresh fractures. The next day, doctors declared Cadyn dead. The cause of death was determined to be a severe lack of oxygen to the brain.

¶7 An examination of Cadyn revealed evidence of broken ribs on both sides of his chest. These fractures were of different ages. Fractures of varying ages indicate that the breaks were nonaccidental. Based on the degree of healing of the bones, Cadyn's ribs were broken well before the day

that Cadyn stopped breathing and paramedics performed CPR[2] on him. Medical experts indicated that these types of rib fractures in infants are most likely caused by squeezing. Cadyn's left leg had also previously been fractured. Cadyn's autopsy revealed hemorrhages and swelling in Cadyn's brain.

¶8 Police were dispatched to the hospital. Two officers, Detective Rick Grabenstein and Detective Timothy Hines, spoke with Mr. Adams to determine what happened to Cadyn. Mr. Adams reiterated what he told paramedics. He also stated that Cadyn had bumped his head on a swing a few days earlier and that he had bumped his head again the night before he stopped breathing.

¶9 When confronted with the fact that Cadyn's injuries were inconsistent with Mr. Adams's account, Mr. Adams asked to speak with his girl friend, Ms. Rowe. An officer brought her in and allowed them to talk. Detective Grabenstein testified that he and Detective Hines were present in the room during the conversation and that Ms. Rowe was seated on Mr. Adams's lap. The detectives overheard Mr. Adams tell Ms. Rowe that he head-butted Cadyn but that he did not think this was what caused the baby's death.

¶10 After Mr. Adams's conversation with his girl friend, the officers advised him of his rights. Mr. Adams indicated that he understood his rights and agreed to answer more questions. He admitted to past acts of grabbing Cadyn under the infant's arms and head-butting him, and of squeezing the infant. He further admitted to head-butting Cadyn twice in the back of the head the morning Ms. Rowe called 911. Mr. Adams confessed that he had shoved socks in Cadyn's mouth in the past to stop him from crying. Two bloody socks were later recovered in Mr. Adams's home. Tests revealed that the blood on both socks was Cadyn's.

¶11 Mr. Adams also told his father that he had put a sock in Cadyn's mouth that morning to muffle his cries. Mr.

---

[2] Cardiopulmonary resuscitation.

Adams told his father that he then went to make his breakfast and, when he returned to check on Cadyn, the baby was not breathing. Mr. Adams's father testified to these admissions at trial.

¶12 Medical experts stated that the evidence that Cadyn suffered from a severe lack of oxygen to the brain was consistent with a sock being stuffed in his mouth, and that the skull fracture was consistent with someone having head-butted the baby. There were also lacerations on Cadyn's tongue. These lacerations further corroborated Mr. Adams's admission to his father that he shoved a sock down Cadyn's throat.

¶13 The State charged Mr. Adams with homicide by abuse, with an alternative charge of second degree murder. Prior to trial, Mr. Adams sought to suppress some of the statements he made to law enforcement. Specifically, Mr. Adams argued that the court should exclude his statements made to police prior to receiving his *Miranda* warnings.

¶14 Mr. Adams argued that these statements were made during the functional equivalent of custodial arrest. Mr. Adams was kept in a small room with no windows. There were two officers in the room with him. These officers were present in the room for purposes of investigating whether Mr. Adams was involved in the death of his son. As a result, Mr. Adams did not feel free to leave.

¶15 Mr. Adams also argued that he was coerced into talking with law enforcement prior to receiving his *Miranda* warnings. Mr. Adams testified that he was very upset at the hospital when he was questioned. He asserted that he had requested a break to use the bathroom but the police would not permit him to leave. This questioning continued for about two to three hours before Mr. Adams was placed under arrest and received *Miranda* warnings.

¶16 The trial court found that Mr. Adams was not in custody when questioned by Deputy Walter Loucks at the hospital and that Mr. Adams's statements were voluntary. The court further determined that there was no indication

that Mr. Adams was threatened or coerced into making any statements to law enforcement. The court did not find Mr. Adams's claims that he was not allowed to leave or to use the bathroom to be credible. Given these findings, the court deemed all of the statements made by Mr. Adams admissible.

¶17 The jury found Mr. Adams guilty of homicide by abuse. He was sentenced to 320 months' confinement. This was the maximum sentence permitted within the standard range for Mr. Adams's offense. This appeal followed.

ANALYSIS

*Should Mr. Adams's second confession have been suppressed because Mr. Adams had not received his* Miranda *rights before his first confession?*

¶18 This court reviews an alleged violation of an individual's right to remain silent and his or her right to counsel de novo. *State v. Baruso,* 72 Wn. App. 603, 609, 865 P.2d 512 (1993). The trial court's findings of fact relating to a motion to suppress are reviewed for substantial evidence. *State v. Levy,* 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). Substantial evidence is evidence that is sufficient to persuade a fair-minded person of the truth of the finding. *Id.* (quoting *State v. Mendez,* 137 Wn.2d 208, 214, 970 P.2d 722 (1999)).

¶19 Mr. Adams claims that his confessions to police, before and after receiving *Miranda* warnings, should have been suppressed based on the illegality of the initial interrogation. Mr. Adams bases his assertion on two premises: (1) that his initial statements to police were in the context of a custodial interrogation and, therefore, police were required to read him his rights before asking any questions and (2) that both sets of admissions (those before and after receiving *Miranda* warnings) were coerced and, therefore, inadmissible for any purpose at trial.

*Custodial Interrogation*

¶20 The admissibility of Mr. Adams's initial statements to police depends, in part, on the trial court's determination that these statements did not occur in the context of a custodial interrogation. Based on this finding, the trial court concluded that police were not constitutionally required to inform Mr. Adams of his *Miranda* rights.

■■ ¶21 The constitutional right against self-incrimination requires that law enforcement inform a suspect of his or her rights to remain silent and to counsel prior to a custodial interrogation. *State v. Cunningham*, 116 Wn. App. 219, 227-28, 65 P.3d 325 (2003). In order for a person to be deemed in custody, his or her freedom to leave must be curtailed to a degree normally associated with formal arrest. *Id.* at 228 (quoting *State v. Watkins*, 53 Wn. App. 264, 274, 766 P.2d 484 (1989)). This determination is based on whether a reasonable person would have perceived that he or she was free to leave. *Id.*

■ ¶22 Here, the trial court found that Mr. Adams was not in custody at the time he was initially questioned prior to receiving *Miranda* warnings. The trial court made this determination based on undisputed findings that Mr. Adams was allowed to see his girl friend, that police would try to arrange time for Mr. Adams to see his son, and that Mr. Adams agreed to join the officers in the hospital conference room where the questioning occurred. The trial court further found that Mr. Adams was free to leave.

¶23 Although Mr. Adams claimed that he requested to use the bathroom and was not permitted to leave to do so, this contradicted the testimony of both police officers who were questioning Mr. Adams. The trial court found the statements of the police officers to be more credible. The court also found that portions of Mr. Adams's testimony did not make sense. This court shows great deference to the credibility determinations of the trial court. *State v. Broadaway*, 133 Wn.2d 118, 134, 942 P.2d 363 (1997).

¶24 Because Mr. Adams did not challenge these specific findings of fact on appeal, they are verities that are binding on this court. *Id.* at 133. Even though Mr. Adams implicitly challenges the trial court's finding of fact that he was not subject to custodial arrest prior to being read his rights, the trial court's remaining unchallenged findings contain substantial evidence supporting the conclusion that Mr. Adams was not under custodial arrest when police initially questioned him.

### Voluntariness

¶25 Mr. Adams contends that all of his admissions to law enforcement were involuntary because they were the product of coercion by the police.

¶26 A confession must be voluntary to be admissible at trial. *State v. Riley*, 17 Wn. App. 732, 735, 565 P.2d 105 (1977). The test for the voluntariness of a confession is whether it appears under the totality of the circumstances that the confession was coerced. *Broadaway*, 133 Wn.2d at 132. The central inquiry is whether the defendant's will was overborne. *Id.* In making this determination, courts look to such factors as the mental state of the defendant, the conduct of the police (with a particular focus on whether any threats or promises were made by the officers), the duration of the interrogation, the defendant's prior experience with police, and the defendant's mental abilities. *Id.*; *State v. Trout*, 125 Wn. App. 403, 414, 105 P.3d 69 (2005).

¶27 In cases of successive confessions, the voluntary nature of a confession given prior to *Miranda* warnings is the touchstone of whether a confession after receiving a *Miranda* warning is admissible. *State v. Wethered*, 110 Wn.2d 466, 473, 755 P.2d 797 (1988). A subsequent confession need not be suppressed unless it was the product of actual coercion or improper tactics by the police. *Id.* at 473-75.

¶28 This court reviews the trial court's findings of fact related to the suppression hearing for substantial evidence. *Trout*, 125 Wn. App. at 414. The trial court found that all of

Mr. Adams's statements were voluntary. To support this finding, the trial court noted that the police made no promise or threat in order to obtain Mr. Adams's statements, and that Mr. Adams volunteered much of the information with no prompting by police. Based on the testimony presented, the trial court concluded that Mr. Adams's will was not overborne and that all of his statements were voluntary. The record supports the trial court's findings of fact, and these findings form a sufficient basis to conclude that Mr. Adams's statements to police were voluntary.

## STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

¶29 Mr. Adams also presents this court with a statement of additional grounds for review. He asserts: (1) the trial court erred by failing to provide the jury with an instruction on the lesser-included offense of first degree manslaughter, (2) he received ineffective assistance of counsel because his attorney failed to request the lesser-included offense instruction, (3) there was insufficient evidence to support his conviction, (4) the trial court erred in admitting an "in life" photograph of Cadyn, (5) the trial court imposed an exceptional sentence, and (6) there was prosecutorial misconduct. Mr. Adams also asserts that his admissions to police were involuntary and were, therefore, inadmissible. This is identical to the issue presented in his primary appeal.

### *Lesser-Included Offense Instruction*

¶30 A defendant is entitled to a lesser-included offense instruction only if the commission of the lesser offense is necessarily included within the charged offense. *State v. Porter*, 150 Wn.2d 732, 736, 82 P.3d 234 (2004). If it is possible to commit the greater offense without committing the lesser offense, then the lesser offense is not an included crime. *Id.*

¶31 At trial, Mr. Adams requested a lesser-included offense instruction for first degree manslaughter. The trial court concluded that manslaughter is not a lesser-included

offense for homicide by abuse. Mr. Adams does not dispute the trial court's conclusion regarding the charge of homicide by abuse. Instead, he argues that first degree manslaughter is a lesser-included offense of the charged alternative offense of second degree murder. According to Mr. Adams, the State's decision to charge second degree murder as an alternative offense entitled him to a jury instruction on manslaughter.

¶32 However, Mr. Adams did not request a lesser-included offense instruction for the charge of second degree murder. The failure to request, or object to, an instruction at trial generally bars a defendant from raising the issue on appeal. *See, e.g., State v. Dent*, 123 Wn.2d 467, 478-79, 869 P.2d 392 (1994).

¶33 Moreover, even if Mr. Adams had requested this instruction, he would not have been entitled to it. In order for a person charged with second degree murder to be entitled to an instruction on the lesser-included offense of first degree manslaughter, "there must be substantial evidence that affirmatively indicates that manslaughter was committed to the exclusion of first or second degree murder." *State v. Perez-Cervantes*, 141 Wn.2d 468, 481, 6 P.3d 1160 (2000). Mr. Adams has failed to show that his acts were merely reckless or negligent rather than intentional. Therefore, Mr. Adams has not established that he was entitled to a lesser-included offense instruction for first degree manslaughter. *See State v. Benn*, 120 Wn.2d 631, 659-60, 845 P.2d 289 (1993).

### *Ineffective Assistance of Counsel*

¶34 Mr. Adams asserts that he received ineffective assistance of counsel due to his trial attorney's failure to request a lesser-included offense instruction on the charged alternative offense of second degree murder.

¶35 Washington applies the two-part *Strickland* test to determine whether a defendant received effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v.*

*Cienfuegos*, 144 Wn.2d 222, 226-27, 25 P.3d 1011 (2001). The defendant must first show that trial counsel's performance was deficient. Then, the defendant must show that the deficient performance prejudiced the defense. *Id.*

¶36 To find that Mr. Adams received ineffective assistance based on the failure of trial counsel to request a lesser-included offense instruction, this court must answer three questions: (1) whether Mr. Adams was entitled to the instruction, (2) whether the failure to request the instruction constituted deficient performance by his counsel, and (3) whether Mr. Adams was prejudiced by this failure. *See id.* at 227.

¶37 As noted above, Mr. Adams was not entitled to a lesser-included offense instruction of manslaughter under the facts of this case. Therefore, trial counsel was not ineffective for failing to request the lesser-included offense instruction.

¶38 Even assuming that Mr. Adams could demonstrate deficient performance, he cannot show prejudice. The jury was provided the opportunity to find Mr. Adams guilty of either homicide by abuse or second degree murder. Manslaughter is only a lesser-included offense of the second degree murder charge. The jury considered, and rejected, the charge of second degree murder in favor of the charge of homicide by abuse. Mr. Adams cannot show that the jury would not have found him guilty of the charge of homicide by abuse if given the alternative charge of manslaughter. Because he cannot demonstrate that the outcome of the trial would have been different had a manslaughter instruction been provided to the jury, Mr. Adams has not demonstrated prejudice, and his assertion of ineffective assistance of counsel is without merit.

### Sufficiency of the Evidence

¶39 Mr. Adams next challenges the sufficiency of the evidence to establish the element of extreme indifference to human life.

¶40 Evidence is sufficient to support a conviction if it would permit any rational juror to find guilt beyond a reasonable doubt. *State v. Berube*, 150 Wn.2d 498, 511, 79 P.3d 1144 (2003). A challenge to the sufficiency of the evidence admits the truth of all the State's evidence. *State v. Pastrana*, 94 Wn. App. 463, 472, 972 P.2d 557 (1999) (quoting *State v. Barrington*, 52 Wn. App. 478, 484, 761 P.2d 632 (1988)). All evidence is viewed in the light most favorable to the State, as are all reasonable inferences that may be drawn from that evidence. *Id.*

¶41 Extreme indifference to human life may be proved by evidence of "an aggravated form of recklessness which falls below a specific intent to kill." *State v. Dunbar*, 117 Wn.2d 587, 593, 817 P.2d 1360 (1991). This element may be proved where the defendant engages in extremely reckless conduct that creates a grave risk of death. *Pastrana*, 94 Wn. App. at 476.

¶42 Mr. Adams admitted that he head-butted his infant son twice in the back of the skull and that he forcibly stuffed a sock in Cadyn's mouth to stop him from crying. A reasonable juror could have concluded that this was extremely reckless conduct that created a grave risk of death. The evidence was sufficient to support Mr. Adams's conviction.

### *Admission of the "In Life" Photograph*

¶43 Mr. Adams asserts that the trial court erred in admitting an "in life" photograph of Cadyn. He asserts that the photograph was irrelevant and that it prejudiced the jury against him.

¶44 "The admission of in-life photographs lies within the discretion of the trial court." *State v. Finch*, 137 Wn.2d 792, 811, 975 P.2d 967 (1999). These photographs are relevant to show the identity of the victim. *Id.*

¶45 Mr. Adams admits that he did not object to the admission of the photograph at trial. An objection to the admission of evidence is waived if it is not raised at trial. *State v. Coria*, 146 Wn.2d 631, 641, 48 P.3d 980 (2002).

*Exceptional Sentence*

¶46 Mr. Adams asserts that, under this court's ruling in *State v. Zavala-Reynoso,* 127 Wn. App. 119, 110 P.3d 827 (2005), he received an exceptional sentence. The standard range sentence for Mr. Adams was 240 months to 320 months. Mr. Adams was sentenced to 320 months' incarceration and 24 to 48 months of community custody. He argues that, when the period of community custody is added to the term of his confinement, his sentence is outside the standard sentencing range.

¶47 Standard range sentences in Washington are governed by the Sentencing Reform Act of 1981. Ch. 9.94A RCW. Generally, a defendant cannot challenge the trial court's imposition of a standard range sentence on appeal. *State v. Williams,* 149 Wn.2d 143, 146, 65 P.3d 1214 (2003). However, this court has authority to correct an erroneous sentence. *Broadaway,* 133 Wn.2d at 136.

¶48 In *Zavala-Reynoso,* this court added together Mr. Zavala-Reynoso's term of confinement and community custody in determining whether Mr. Zavala-Reynoso received an exceptional sentence. *Zavala-Reynoso,* 127 Wn. App. at 124. While his term of confinement was within the statutory range, the combined length of time of the confinement and period of community custody was not. *Id.* Therefore, this court concluded that Mr. Zavala-Reynoso had received an exceptional sentence. *Id.*

¶49 What Mr. Adams fails to note is that the statutory maximum at issue in *Zavala-Reynoso* is that found in chapter 9A.20 RCW. *See* RCW 9.94A.505(5). Mr. Adams was convicted of homicide by abuse. This crime is a class A felony. RCW 9A.32.055(3). The statutory maximum for class A felonies is life imprisonment. RCW 9A.20.021(1)(a). Mr. Adams's sentence does not exceed the relevant statutory maximum.

*Prosecutorial Misconduct*

¶50 Mr. Adams claims that the prosecutor committed misconduct by asking a witness a question on cross-exami-

nation that the trial court deemed to be beyond the scope of direct examination. The prosecutor asked Mr. Adams about alleged statements that Mr. Adams had made to his father.

¶51 A defendant asserting prosecutorial misconduct must establish both that the prosecutor's conduct was improper and that it was prejudicial. *Finch*, 137 Wn.2d at 839. Prejudice is not established unless there is a substantial likelihood that the misconduct affected the jury's verdict. *Id.*

¶52 Here, the prosecutor asked Mr. Adams a question that the trial court found to be beyond the scope of direct examination. This, by itself, does not constitute misconduct.

¶53 Mr. Adams also has no basis to assert prejudice. The prosecutor made no personal statements to the jury regarding conversations that Mr. Adams may have had with his father. And, Mr. Adams did not answer the offending question. Because the jury heard nothing regarding the substance of this alleged conversation with his father, there is no likelihood that the prosecutor's question affected the jury's verdict. Consequently, Mr. Adams cannot demonstrate prejudice, and his assertion of prosecutorial misconduct is without merit.

¶54 We affirm.

SWEENEY, C.J., and BROWN, J., concur.

Review denied at 161 Wn.2d 1006 (2007).