# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

      Respondent,

      v.

JEREMIAH LANCE WINCHESTER,

      Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

No. 68906-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: September 15, 2014

APPELWICK, J. — Winchester appeals his judgment and sentence for attempted possession of heroin, attempted robbery in the first degree, and unlawful possession of a firearm. He argues that there were three significant defects at his trial. First, he alleges that the trial court failed to adequately inquire into his request for new counsel. Second, he contends that the court improperly admitted statements he involuntarily made to police while recovering from a major injury. Third, he asserts that the prosecutor committed misconduct by improperly shifting the burden of proof during closing argument.

Winchester challenges his sentence for attempted robbery, because the combined term of confinement and community custody exceeded the statutory maximum. He also asserts that his attempted possession conviction was unranked and thus not subject to a firearm enhancement. Winchester raises four issues in his statement of additional grounds. We affirm.

## FACTS

On November 22, 2011, Jeremiah Winchester, his son, Jesse[1] Winchester, Gavin Glyzinski, and Johnny Arellano went to the home of Melinda Wilson and Rob Lara. Winchester asked Lara if he knew someone who could get Winchester $1,800 worth of

---

[1] We use some first names and nicknames for clarity. No disrespect is intended.

heroin. Lara knew someone called "Chuko," whose real name was Salvador Rodriguez. Winchester asked Lara to call Chuko. Lara did. Chuko said he could supply the heroin and would be there in about an hour. Winchester said that he planned to take Chuko's guns and money.

Chuko arrived with his brother, Oscar Rodriguez (nicknamed "Scrappy"), and a man named Andrew Medina. Chuko carried a black backpack. Lara led Chuko, Scrappy, and Medina upstairs, where the other men and Wilson were.

Things escalated quickly. One of the men in Chuko's group pulled out a gun. Winchester picked up a gun that lay at his feet. He grabbed one of the men by the shoulder and asked, "'Where are you going?'" The man turned around and shot Winchester in the face.

More shots were fired. Chuko, Scrappy, and Medina fled. Lara found Jesse at the bottom of the stairs, clutching his chest. Wilson called 911. Jesse ultimately died. Lara also found a bag on the stairs, which was not there before Chuko arrived. The bag contained heroin and methamphetamine.

Winchester was taken to the hospital. The bullet had entered his cheek and shattered everything back to his neck. It remained lodged near his spine. Detective Lee Beld visited Winchester in the hospital three times and spoke with him about the incident. The two latter interviews were tape recorded.

Winchester was charged with attempted possession of a controlled substance (heroin), count I; attempted possession of a controlled substance (methamphetamine), count II; attempted first degree robbery, count III; and second degree unlawful possession

of a firearm, count IV.[2] The jury found Winchester guilty of counts I, III, and IV, with a special firearm verdict on counts I and III.

He appeals his judgment and sentence.

## DISCUSSION

Winchester alleges three trial errors: improper denial of his request for new counsel, improper admission of his statements to police, and prosecutorial misconduct. He also challenges his sentence for attempted robbery and the firearm enhancement on his sentence for attempted possession. In addition, he raises four issues in his statement of additional grounds.

## I.  Request for New Counsel

Winchester argues that the trial court abused its discretion in denying his request for new counsel, because it did not adequately inquire into his request. We review a trial court's refusal to appoint new counsel for abuse of discretion. State v. Cross, 156 Wn.2d 580, 607, 132 P.3d 80 (2006). The factors to consider are (1) the extent of the conflict, (2) the adequacy of the trial court's inquiry, and (3) the timeliness of the motion. In re Pers. Restraint of Stenson, 142 Wn.2d 710, 724, 16 P.3d 1 (2001) (adopting the test set out in United States v. Moore, 159 F.3d 1154, 1158-59 (9th Cir. 1998)). An adequate inquiry requires a full airing of the defendant's concerns and a meaningful inquiry by the court. Cross, 156 Wn.2d at 610. "Formal inquiry is not always essential where the defendant otherwise states his reasons for dissatisfaction on the record." State v. Schaller, 143 Wn. App. 258, 272, 177 P.3d 1139 (2007). A defendant must demonstrate

---

[2] The State charged and tried Arellano as a codefendant. Glyzinski was initially charged as a codefendant, but made a plea deal with the State. Lara and Wilson were not charged at the time of trial.

good cause to warrant substitution of counsel, such as a conflict of interest or a complete breakdown in attorney-client communications. State v. Stenson, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997).

In State v. Varga, 151 Wn.2d 179, 200-01, 86 P.3d 139 (2004), the court adequately considered the merits of James Foy's request. Foy expressed general dissatisfaction and distrust with his counsel's performance. Id. at 200. The court allowed him to explain the reasons for his dissatisfaction and questioned counsel about the merits of Foy's complaint. Id. at 200-01. Counsel responded that he had consulted Foy about trial tactics and advised him of his legal rights. Id. at 201. This was a sufficiently searching inquiry. Id.

Likewise, in Schaller, the court provided the defendant an adequate opportunity to voice his concerns. 143 Wn. App. at 271. Initially, Schaller told the court that he had no problems communicating with his attorneys. Id. at 262. However, he later made multiple requests to substitute counsel. See id. at 263-66. He complained that he was not provided certain discovery and accused his attorneys of lying to him. Id. at 263. Schaller then moved to fire his attorneys for disclosing case details to his ex-wife. Id. at 264. He also accused counsel of asking him to commit perjury. Id. at 265. The trial court denied his requests. Id. at 263-67. It concluded that, despite Schaller's animosity toward his attorneys, he was able to communicate with them. Id. at 267. We affirmed. Id. at 272. Schaller was able to address his concerns in front of multiple judges. Id. at 271. The judges questioned Schaller about whether his conflicts affected his case and also heard from his counsel. Id. at 265, 271. These inquiries did not reveal a complete

communication breakdown. Id. at 271. The trial court properly denied Schaller's requests. Id. at 272.

Here, Winchester expressed several concerns to the court during motions in limine the morning before jury selection:

> MR. WINCHESTER: Your Honor, I just have a couple of questions. I don't know how this all works, but yeah, I haven't seen discovery. I was introduced to my lawyer once, and then I talked to him with the investigator once. They read me one page of discovery, but they both had to go.
>
> I saw him again when he told me about a plea agreement with someone, and that's the only times that I talked to him. I haven't seen any of discovery. I haven't helped in my own defense at all.
>
> I don't understand why I can't get a change of venue after what the paper has done, after some of the things that happened in this country, especially the sheriffs [sic] department surrounding my house SWAT [Special Weapons and Tactics]-team style and telling all my witnesses that I sent them there to get these statements. I mean, I didn't know that was the deal.
>
> The sheriffs actually lied to my witnesses after I asked them in my house.

The court told Winchester that there had been no motion for change of venue, but the jurors would be questioned during voir dire about their knowledge of the case. It also noted that there were several days before trial during which Winchester could talk to defense counsel about his concerns and review discovery. Shortly before Winchester's request, counsel had asked that Winchester be able to review the discovery he sought. Counsel also commented that he and Winchester had numerous phone calls in addition to their meetings. The court concluded that Winchester and counsel could work out any issues and bring a motion if necessary.

The next day, Winchester again raised concerns:

> MR. WINCHESTER: Your Honor, I would like to say something at this time . . . so far, my lawyer I've seen him three times, and before the jury selection happens, I don't feel confident I've had adequate counsel.
>
> I waited this whole time. He told me the whole time it's going to come out, it's going to come out. I found out today some numerous things that have happened with the other witnesses and numerous things that happened to my witnesses, investigators came up one time to talk to my witnesses at my house.
>
> At this point, I would like to ask for new counsel.

The court told Winchester that it was too late for new counsel, but that he still had time to work with his current counsel before trial.

Winchester then indicated displeasure that "over half of the witnesses that I wanted were not questioned, and the half that was [sic] questioned were told that we're not asking the questions that they needed to be asked, and were not even put on the witness list." The court replied that, without a list of the witnesses Winchester wanted to call, it could not address his complaint. Instead, the court said, Winchester could raise these concerns to his attorney.

Winchester replied, "I believe the Whatcom County court is doing this, there is [sic] numerous witnesses for the prosecution that are not being charged until they make a successful statement as to what they are likely to say on the stand." The court replied that only the prosecutor controls who is charged, but that Winchester could cross-examine the witnesses that troubled him.

The prosecutor noted that, in his experience, defense counsel had been diligent in interviewing major witnesses. The court responded:

THE COURT: I understand Mr. Winchester's claim not to be that. His claim is that there are people who he would have liked to have called as witnesses that haven't been investigated by Mr. Brodsky, and that's --

MR. WINCHESTER: I didn't –

THE COURT: -- between Mr. Winchester and Mr. Brodsky at this point.

We're going to go forward.

MR. WINCHESTER: I didn't say that these were people that I wanted to call. These are people that the prosecution is going to put up on the stand--

THE COURT: Anybody that they're bringing, you already know about.

MR. WINCHESTER: Yeah, there's witnesses that have charges hanging over their head --

THE COURT: That, again --

MR. WINCHESTER: -- that --

THE COURT: -- that can't --

MR. WINCHESTER: The charges are in limbo until they testify on the stand --

THE COURT: The prosecutor --

MR. WINCHESTER: -- whether or not the charges are going to happen.

THE COURT: The prosecutor is the only one that can decide whether something is charged. I have nothing to say about that. I can't do nothing [sic] about that.

MR. WINCHESTER: Well, I know that.

THE COURT: So then --

MR. WINCHESTER: I just want that mentioned on the record.

The court proceeded with motions in limine. Winchester did not renew his request for new counsel.

Winchester argues that this inquiry was insufficiently searching. But, the trial court allowed Winchester to express his dissatisfactions and addressed them in turn. Winchester alleged insufficient contact with his lawyer, not an inability to communicate. The court heard his complaint, advised him to contact his lawyer, and assured him that he still had time to remedy the problem. Likewise, when Winchester complained about witnesses, the court directed him to contact counsel to resolve the issue. Winchester then clarified that his complaint was about the prosecution's witness handling—a matter unrelated to his own attorney and out of the court's control. As in Schaller, the trial court heard Winchester's concerns about his representation and determined that they did not warrant new counsel.

Viewed in context, Winchester did not allege a complete communication breakdown or an irreconcilable conflict. In fact, most of Winchester's complaints did not pertain to the attorney-client relationship. Instead, he expressed apprehension about the venue of his trial, the sheriff's conduct, and the prosecutor's failure to charge certain witnesses. The trial court heard all of Winchester's concerns and meaningfully inquired into them. The court did not abuse its discretion in denying Winchester's request for new counsel.

II.    Statements to Police

Winchester asserts that the trial court improperly admitted the statements he made to Detective Beld while in the hospital. This is so, he contends, because the statements

were involuntary under the due process test and he was not read his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

When reviewing the trial court's denial of a motion to suppress, we ask whether substantial evidence supports the challenged findings of facts. State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). Substantial evidence is evidence sufficient to persuade a rational, fair-minded person of the finding's truth. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). Unchallenged findings of fact are verities on appeal. Levy, 156 Wn.2d at 733. We review the court's conclusions of law de novo. Id.

Winchester challenges the court's finding that he "was told that he was not under arrest." There is no evidence that Detective Beld explicitly informed Winchester that he was not under arrest. Instead, Detective Beld told Winchester that the police were there to protect him. This might imply that Winchester was not under arrest. But, an implication is not the equivalent of an explicit statement. Substantial evidence does not support the court's finding. We do not treat it as a verity on appeal. Winchester challenges no other findings of fact. We accept the remaining findings as verities. Id.

Detective Beld met with Winchester at the hospital three times: twice on November 24, 2011, and once on November 26, 2011. During the first meeting, Winchester was in intensive care. It was two days after he was shot. Detective Beld visited him at approximately noon. Winchester's tongue was swollen and his hearing was impaired from his injuries. He had a breathing tube in his throat, which was removed when Detective Beld arrived. Winchester was groggy and hard to understand. Winchester, Detective Beld, and Winchester's family members discussed the incident and came to a brief understanding of what happened. Detective Beld did not advise Winchester of his

9

constitutional rights. The conversation was not recorded. However, Detective Beld's testimony does not suggest that Winchester made incriminating statements.

The second meeting was that night around 8:00 p.m. Detective Beld told Winchester that deputies were outside the room for his protection. He did not advise Winchester of his constitutional rights. The interview was recorded. Detective Beld stated on tape that Winchester gave consent. Winchester acknowledged that he was being recorded. He was clearer than he had been in the previous interview and answered the detective's questions in more detail. He occasionally had trouble staying awake.

Detective Beld spent much of the interview trying to figure out who shot Winchester. At one point, however, Detective Beld asked,

Q: Oh. You had a revolver, right?

A: Mm-hm.

Q: Jeremiah, you had a revolver, right?

A: (Unintelligible).

Q: You what?

A. (Unintelligible) him. I never fired a shot with it.

Detective Beld also told Winchester that officers found a bag of drugs, which contained heroin, methamphetamine, and marijuana. He asked Winchester if the bag was his. Winchester responded, "It's not mine."

On November 26, Detective Beld visited Winchester for a third time. Again, Winchester acknowledged that the interview was recorded. Detective Beld did not advise Winchester of his constitutional rights.

Detective Beld began by showing Winchester a photo lineup to help identify the third suspect. They discussed why Chuko came over that night. Detective Beld asked if Winchester had Lara call Chuko, to which Winchester replied, "Yup." Later, Winchester asked if he could be in trouble for having a gun. Detective Beld replied,

Q: I don't know. Can you get in trouble?

A: (Unintelligible).

Q: No, I know. And that's gonna be up to the prosecutor. But...

A: (Unintelligible)...

Q: I think - I think right now - I mean, the choice is yours, right? You don't have to talk about. But havin' the truth out there - because I think the truth is gonna come out regardless.

A: (Unintelligible).

Q: Could you get in trouble? You could. I mean, you need to know that. I'm not gonna lie to ya. Will you? I don't know. . . I - you know, that's just not something we're gonna deal with at the moment.

They then continued discussing the events of November 22 and the possible identity of the third suspect. The interview lasted 27 minutes.

On April 2, 2012, the court held a CrR 3.5 hearing to address whether the interview transcripts should be admitted. Winchester argued that his statements were not voluntary, because he was coming out of a coma and deeply medicated. The court observed that, according to Detective Beld's testimony, Winchester was able to answer questions and became clearer-headed with each interview. The court further noted that there was no evidence about Winchester's medication or its effects. It concluded that the statements were admissible.

A. Custodial Interrogation

Winchester argues that he was in custody when he spoke to Detective Beld and should have been read his Miranda rights. We review Miranda issues de novo. State v. Daniels, 160 Wn.2d 256, 261, 156 P.3d 905 (2007), adhered to on recons., 165 wn.2d 627, 200 P.3d 711 (2009). Miranda warnings must be given whenever a suspect is subject to custodial interrogation by a state agent. Miranda at 467-68. The objective test for whether a suspect is in custody is if a reasonable person in his or her position would feel that his or her freedom was curtailed to the degree associated with a formal arrest. Berkemer v. McCarty, 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). To constitute custody, the restriction on the suspect's freedom of movement must be police-created. See, e.g., State v. Butler, 165 Wn. App. 820, 827-28, 296 P.3d 315 (2013); State v. Kelter, 71 Wn.2d 52, 54, 426 P.2d 500 (1967).

In Kelter and Butler, the suspects were interviewed by police while in the hospital. 71 Wn.2d at 54; 165 Wn. App. at 828. The Kelter court concluded that the suspect was not in custody because, although he was confined to his hospital room, he was not arrested or restrained by the police. 71 Wn.2d at 54. Likewise, in Butler, the suspect was restricted to his hospital room because of his injuries—not because of the police. 165 Wn. App. at 828. The Butler court observed that there were no police stationed outside the room. Id. However, the presence of officers does not distinguish the present case from Butler. Police were stationed outside of Winchester's room for protection, and he was clearly told so. Winchester was not in custody during his interviews with Detective Beld. And, when the hospital released him, the police did not detain him.

12

B. Due Process Voluntariness

Winchester asserts that his statements to the police were inadmissible, because they were not voluntarily made. An involuntary confession is inadmissible at trial. State v. Riley, 17 Wn. App. 732, 735, 565 P.2d 105 (1977). We review de novo the trial court's conclusion that a statement was freely and voluntarily given. Butler, 165 Wn. App. at 827. The test for the voluntariness is whether, under the totality of the circumstances, it appears that a confession was coerced. State v. Broadaway, 133 Wn.2d 118, 132, 942 P.2d 363 (1997). The central inquiry is whether the defendant's will was overborne. Id. In making this determination, courts look to factors such as the defendant's mental state, the police conduct, the duration of the interrogation, the defendant's prior experience with police, and the defendant's mental abilities. State v. Adams, 138 Wn. App. 36, 46, 155 P.3d 989 (2007).

Winchester argues that, due to his clouded mental state, his will was overborne. He relies heavily on Mincey v. Arizona, 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). In that case, a detective persistently interrogated the suspect, who was in the intensive care unit, encumbered by a breathing apparatus, and barely conscious. Id. at 399. The detective told Mincey that he was under arrest, read him his Miranda rights, and began to question him. Id. 396. Mincey was unable to talk because of the tube in his mouth and had to answer questions by writing on a piece of paper. Id. The detective interrogated him for almost four hours, despite Mincey's repeated requests for a lawyer. Id. Mincey also complained several times that he was confused or unable to think clearly and that he could answer more accurately the next day. Id. at 400-01. The United States Supreme Court found it was clear that Mincey did not want to answer the detective's

13

questions, but "weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, [Mincey's] will was simply overborne." Id. at 401-402.

However, a suspect's will is not always overborne simply by the fact that he is questioned while in pain or under the effect of medication. See, e.g., United States v. George, 987 F.2d 1428, 1430 (9th Cir. 1993); State v. Peerson, 62 Wn. App. 755, 774, 816 P.2d 43 (1991). In George, the suspect was taken to the hospital after passing out due to several heroin-filled balloons in his alimentary canal. 987 F.2d at 1430. The Ninth Circuit found that George's subsequent statements were voluntary. Id. at 1431. An officer came to the hospital, arrested George, and read him his Miranda rights. Id. at 1430. When the officer first arrived, George was unconscious and did not stabilize for about four hours. Id. But, at the time of his interrogation, George was coherent, gave responsive answers to the officer's questions, and accurately remembered his motel and room number. Id. at 1431. The court also observed that the officer asked simple questions, kept the interview short, and received no indication that George wanted a lawyer. Id. The case was thus distinguishable from Mincey. Id.

The present case is likewise distinguishable. Winchester agreed to speak with Detective Beld and did not request a lawyer. Per the transcripts, many of Winchester's responses were "unintelligible." However, the answers to follow up questions suggest that this was due to his swollen tongue, rather than fatigue or confusion. Winchester notes that he sometimes drifted in and out of consciousness. But, Detective Beld regained Winchester's attention before resuming questioning. He asked short, direct questions and offered to help Winchester communicate by repeating or paraphrasing what he said. And, when Winchester appeared to have trouble answering questions,

Detective Beld offered to stop the interview. Winchester became increasingly clear and responsive with each interview. The interviews were short—the third lasted only 27 minutes.[3] There is no evidence that his medication or his injury affected his decision-making abilities. Neither Winchester's condition nor Detective Beld's behavior make this case like Mincey.

Winchester further argues that his will was overborne by Detective Beld's use of subtle, friendly coercion to take advantage of his grief and injuries. Winchester relies on a Michigan case, People v. Hooks, 112 Mich. App. 477, 316 N.W.2d 245 (1982). In Hooks, the officer took an incriminating statement from the defendant while he was on a life support machine. Id. at 479. The case does not otherwise describe the officer's method of obtaining the statement. See id. But, it states that "in many ways the subtle, friendly coercion that can be exerted on one who is helpless and seriously wounded in a hospital room is more effective than offers of leniency, in rendering one's statements involuntary." Id. at 482.

It is well-settled, however, that police may elicit a confession through psychological ploys, such as playing on a suspect's sympathies, as long as the confession is a product of the suspect's own balancing of competing considerations. See, e.g., State v. Unga, 165 Wn.2d 95, 102, 196 P.3d 645 (2008); State v. Rupe, 101 Wn.2d 664, 679, 683 P.2d 571 (1984); State v. Rafay, 168 Wn. App. 734, 758, 285 P.3d 83 (2012), review denied, 176 Wn.2d 1023, 299 P.3d 1171 (2013). For example, in Unga, the appellant argued that a detective induced his confession with a promise not to prosecute. 165 Wn.2d at 107.

---

[3] It is unclear how long the second interview lasted. But, the transcript of the second interview is shorter than the third.

The court noted that a "promise does not per se render a confession involuntary; it is one factor among the totality of the circumstances." Id. at 108. Unga received his Miranda rights, understood and waived those rights, and was old enough to make a voluntary and intelligent statement. Id. at 108. There was no evidence that he lacked capacity. Id. Unga's questioning lasted only 30 minutes, he was in a room with the door left open, and there was no evidence that the detective used a threatening tone or intimidated him. Id. at 109. And, there was no evidence that Unga was denied food, sleep, or bathroom facilities. Id. Under the totality of the circumstances, Unga's confession was not coerced. Id. at 111.

Winchester was not arrested or read his Miranda rights. In fact, Detective Beld generally treated Winchester as a victim, not a suspect. Detective Beld told Winchester, "I'm working really hard to get some justice here," and asked him, "You wanna help me every way you can, right?" In this way, Detective Beld communicated that his motive for interviewing Winchester was to find out what happened and solve the case. During the second interview, however, Detective Beld asked Winchester if he had a gun. Whatever other investigative value this question served, the answer had the potential to and did incriminate Winchester. Winchester maintains that this was Detective Beld's motive all along: to subtly seek admissions from Winchester that could later be used to convict him.

Assuming—without deciding—this was Detective Beld's strategy, we do not agree that his method of questioning overbore Winchester's will. Detective Beld did not make any promises to Winchester or lie to him about the effect of his statements. Compare Unga, 165 Wn.2d at 107. Some of Detective Beld's questions elicited incriminating responses. But, these questions were direct and clear. Winchester's responses showed

he understood the questions. As discussed above, there is no evidence that Winchester's physical or emotional state rendered him unable to make decisions. Detective Beld did not suggest that the answer to these questions were any more or less important to catching Jesse's killer than any other questions. He did not juxtapose incriminating questions with appeals to Winchester's emotions. Winchester had an extensive criminal history and was therefore familiar with police interactions. And, Winchester was 40 years old, well old enough to make a voluntary and intelligent statement. See id. at 109 (16 year old defendant able to make voluntary and intelligent statement). Under the totality of the circumstances, it was not an abuse of discretion for the trial court to conclude that Winchester's will was not overborne.

The trial court properly admitted Winchester's statements.

## C. Ineffective Assistance of Counsel

Winchester argues that, should we find his statements properly admitted, his counsel was ineffective for not developing a full record at the CrR 3.5 hearing. He maintains that counsel should have presented evidence about the effect of his medications, as well as about additional circumstances demonstrating coercion.

To demonstrate ineffective assistance, an appellant must show that the attorney's performance was deficient and that the deficiency was prejudicial. State v. Thomas, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). Deficient performance is that which falls below an objective standard of reasonableness. In re Det. of Moore, 167 Wn.2d 113, 122, 216 P.3d 1015 (2009). Prejudice occurs if, but for the deficient performance, there is a reasonable probability that the outcome of the proceedings would have been different. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). A reviewing court

need not address both prongs if an appellant fails to make a sufficient showing under one prong. See Thomas, 109 Wn.2d at 226. If it is easier to dispose of an ineffective assistance claim on the ground of insufficient prejudice, the court should follow that course. Strickland v. Washington, 466 U.S. 668, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Winchester focuses his challenge on counsel's failure to introduce additional evidence at the CrR 3.5 hearing. The trial court noted that Winchester offered no evidence that medication impaired his cognitive abilities. Winchester urges that, had this evidence been before the court at that time, his statements would have been excluded. Winchester makes no showing that such evidence was in fact available. Instead, he asks us to presume that it was. Winchester cannot establish deficient performance based on a presumption.

Moreover, Winchester does not demonstrate prejudice. Winchester's first incriminating statement was that he had a gun. But, two other witnesses—Glyzinski and Wilson—testified to this fact at trial. Winchester argues that a defendant's confession has significant impact on the jury. He also questions Glyzinski's and Wilson's credibility. But, these arguments go to the weight of the evidence, a question for the finder of fact. See State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). The jury heard the interview excerpt where Winchester admits he had a gun. This allowed the jury to consider any coercive influences on his statement. The jury also witnessed impeachment of Glyzinski's and Wilson's credibility. It was therefore able to assess the relative weight of the evidence. We do not review that determination on appeal. Id.

Winchester's other incriminating statement was that he asked Lara to call Chuko. But, Lara also testified to this fact at trial. And, the jury heard a recording of the following exchange:

> Q: When you - when you had [Lara] call [Chuko], did you have [Lara] call [Chuko] specifically? Or did [Lara] just call [Chuko] and you said, "Oh, I r- I know this guy," was it?
>
> A: No, [Lara] called [Chuko] specifically.
>
> Q: You had him call [Chuko] specifically? And that's because this guy's been rippin' off people?
>
> A: (Unintelligible) take his guns away from him.
>
> Q: You wanted - he was what?
>
> A: Taking his guns away from him.

The jury was therefore able to consider the circumstances under which Winchester made these statements and weigh them in light of Lara's corroborating testimony. Winchester does not demonstrate ineffective assistance of counsel.

III.   Prosecutorial Misconduct

Winchester contends that the prosecutor committed misconduct in his closing argument by impermissibly shifting the burden of proof. Prosecutorial misconduct is grounds for reversal where the conduct is both improper and prejudicial. State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011). It is flagrant misconduct for a prosecutor to shift the burden of proof to a defendant. State v. Miles, 139 Wn. App. 879, 890, 162 P.3d 1169 (2007). If the defendant objected to the misconduct at trial, we determine whether the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. State v. Sakellis, 164 Wn. App. 170, 184, 269 P.3d 1029 (2011). Alternatively, if

19

the defendant failed to object at trial, we ask whether the misconduct was so flagrant and ill-intentioned that any resulting prejudice could not be cured by a jury instruction. Id.

During closing argument, the prosecutor discussed Detective Beld's testimony that Glyzinski and Winchester admitted that Winchester had a gun. In response, defense counsel questioned the testimony's reliability:

> Detective Beld was not alone in that room with Gavin Glyzinski. Sergeant Bos[s] was in there, too. He testified to that. Where's Sergeant Bos[s]? We didn't hear from him, did we? The State had somebody who could support Detective Beld's version of events who is sitting in the room, another law enforcement officer. Why didn't they call him? I submit it's because he wouldn't have supported that version of events, and if Detective Beld is willing to lie about what happened in that room with Gavin Glyzinski, we have to question what else he's willing to lie about in this case.

Defense counsel also addressed Winchester's interview:

> But [Detective Beld] wasn't alone. Again, Sergeant Bos[s] was with him. Where is Sergeant Bos[s's] testimony to say, to agree, yes, Jeremiah did nod when I asked him that; yes that's what he said, I heard it too? He's a law enforcement officer. Why wasn't he here to testify unless, unless he just didn't agree with what Detective Beld had said or done? So we're left to believe what Detective Beld tells us, because you can't transcribe a nod. So all we have is Detective Beld saying, "You're nodding."

In rebuttal, the prosecutor stated that,

> Mr. Brodsky said the State didn't call Sergeant Bos[s]. Now, there are a lot of police officers that were involved in this search and this entire investigation, many, many officers.
>
> . . . We don't call all of those people, so we can get through trials in a reasonable time. I call witnesses by giving them subpoenas. The Defense can do the same thing. Mr. Brodsky if he wanted Sergeant Bos[s] to be here --
>
> MR. BRODSKY: Objection, Your Honor. This is burden shifting. We have no burden to call witnesses or produce evidence.
>
> THE COURT: Th[at]'s true. The jury is reminded that counsel's statements are not evidence in this case.

20

MR. McEACHRAN: Thank you, Your Honor.

As far as witnesses, everyone can call them, and it isn't just the State that controls here.

MR. BROSKY: Your Honor, he's engaging in the same burden shifting that the State --

THE COURT: I think that statement is acceptable. We won't go any further.

Winchester argues that the prosecutor's statements improperly shifted the burden of proof. The State may not suggest that the defense has the burden to prove its case. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). But, not every comment on a defendant's failure to produce witnesses impermissibly shifts the burden of proof. State v. Blair, 117 Wn.2d 479, 491, 816 P.2d 718 (1991).

For example, under the missing witness doctrine, the jury may draw an unfavorable inference when a party fails to call a witness who is within that party's control to provide testimony that would properly be part of the case and in the interest of that party. Id. at 485-86. The unfavorable inference arises "'only where, under all the circumstances of the case, such unexplained failure to call the witnesses creates a suspicion that there has been a willful attempt to withhold competent testimony.'" Id. at 488 (quoting State v. Baker, 56 Wn.2d 846, 859-60, 355 P.2d 806 (1960)). The absent witness must also be particularly under the opposing party's control, rather than being equally available to both parties. Id. at 491; see also State v. Montgomery, 163 Wn.2d 577, 598-99, 183 P.3d 267 (2008).

Here, the prosecutor responded to defense counsel's improper attempt to invoke the missing witness doctrine. Defense counsel asked the jury to draw an unfavorable inference from the State's failure to call Sergeant Boss. But, Sergeant Boss was not

21

particularly under the State's control—either party can call a police officer to the stand. The prosecutor made this point when he said, "As far as witnesses, everyone can call them, and it isn't just the State that controls here." This did not suggest that Winchester bore a burden to present evidence of his innocence.

Moreover, the jury was repeatedly instructed about the proper burden of proof. When defense counsel said, "We have no burden to call witnesses or produce evidence," the court replied, "Th[at]'s true." After closings concluded, the trial court reminded the jury, "the instructions here are your guide, and Instruction No. 3 does set out clearly what the burden of proof is in this case, and who has that burden of proof." Instruction 3 explained that the "State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements." During closing, the prosecutor reviewed instruction 3 with the jury. Defense counsel also addressed instruction 3:

> We got [sic] this instruction that talks about the burden of proof. It's clear that the State has the burden, the burden as to every, every element of the case, the State, and Mr. Winchester has no burden.
>
> I often tell jurors what I tell my clients sometimes, you know, we could play gin the whole time. We don't have to call witnesses. We don't have to ask questions. If the State doesn't prove its case, then you're not guilty. We have no burden of proof in this case. It's part of the instructions.

At the end of the prosecutor's rebuttal, after the challenged statements, the prosecutor clarified that "the standard that the State has is prove beyond a reasonable doubt. We're willing to assume that." It was clear to the jury that the State bore the burden of proof.

The prosecutor did not commit misconduct.[4]

---

[4] Winchester alleges cumulative error with respect to these first three challenges. We found no error.

IV. Sentencing Errors

Winchester alleges three sentencing errors, two of which relate to community custody and one that relates to the firearm enhancement on his attempted possession conviction.

A. Statutory Maximum

Winchester asserts that his sentence for attempted robbery exceeded the statutory maximum. The court sentenced Winchester to 120 months confinement, plus 18 months of community custody. The statutory maximum for attempted robbery in the first degree is 120 months. RCW 9A.28.020(3)(b); RCW 9A.56.200(2); RCW 9A.20.021(1)(b). If an offender's combined term of confinement and term of community custody exceed the statutory maximum for the crime, the trial court shall reduce the term of community custody. RCW 9.94A.701(9); State v. Boyd, 174 Wn.2d 470, 473, 275 P.3d 321 (2012). The State concedes this error.

When the trial court enters an invalid sentence, the remedy is to remand for resentencing unless the record makes clear that the court would have imposed the same term of confinement anyway. See State v. Parker, 132 Wn.2d 182, 192-93, 937 P.2d 575 (1997). On count III, Winchester faced a standard range of 96.75 to 120 months of confinement, plus a 36 month firearm enhancement. The trial court initially imposed 156 months for the attempted robbery: 120 months of standard confinement, plus the 36 month firearm enhancement. The prosecutor alerted the court that the confinement time must be reduced to accommodate the firearm enhancement within the statutory maximum. The court then amended the confinement time to 120 months: 84 months of standard confinement, plus the 36 month enhancement. The court also found that

Winchester's high offender score warranted an exceptional sentence upward. It is clear that the trial court intended to impose the maximum amount of confinement possible.

We remand for the trial court to strike Winchester's term of community custody.[5]

B. Firearm Enhancement

Winchester contends that the trial court lacked the authority to impose a firearm enhancement on his conviction for attempted possession of a controlled substance. Anticipatory offenses charged under RCW 69.50.407 generally do not have a seriousness level and are therefore unranked. State v. Mendoza, 63 Wn. App. 373, 378, 819 P.2d 387 (1991). Firearm enhancements do not apply to unranked felonies. State v. Soto, 177 Wn. App. 706, 716, 309 P.3d 596 (2013). Thus, Winchester concludes, his conviction was not subject to a firearm enhancement.

However, any felony offense under chapter 69.50 RCW with a deadly weapon special verdict has a seriousness level of III. RCW 9.94A.518. Winchester was convicted of a felony in violation of RCW 69.50.407 and RCW 69.50.4013. The jury found that Winchester committed this offense while armed with a firearm. The jury's finding constituted a deadly weapon special verdict. State v. McGrew, 156 Wn. App. 546, 559, 234 P.3d 268 (2010). Winchester's conviction for attempted possession of a controlled substance while armed with a firearm is therefore ranked.

The trial court properly imposed a firearm enhancement on Winchester's attempted possession conviction.

---

[5] Winchester challenges his community custody condition that prohibits him from consuming or possessing "any alcohol or drugs." Because we remand to strike the community custody term, we need not consider this assignment of error.

V.    <u>Statement of Additional Grounds</u>

Winchester also raises four issues in his statement of additional grounds. He makes three evidentiary challenges and alleges that his convictions violate double jeopardy.

A. <u>Hearsay</u>

Winchester maintains that the court prematurely sustained the State's hearsay objection without hearing the challenged evidence. This seems to imply that the court's ruling precluded proper evidence that it had not yet heard. It did not. The court's ruling excluded the improper evidence that was presented and precluded any similarly improper testimony that might have followed. Winchester was free to present subsequent admissible evidence.

In the alternative, Winchester argues that the evidence was admissible under one or more hearsay exceptions. Winchester raises these exceptions for the first time on appeal. We will not find error based on an evidentiary grounds not raised at trial. <u>State v. Powell</u>, 166 Wn.2d 73, 82-83, 206 P.3d 321 (2009) (a party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial.).

B. <u>False Evidence</u>

Winchester asserts that the State presented false evidence through Detective Beld's testimony. First, Winchester argues that Detective Beld fabricated a motive for Winchester to commit robbery by testifying that Winchester said Chuko owed money to him and his friends. But, Winchester confirmed this detail in his interview on November 24. Second, Winchester asserts that Detective Beld fabricated a belief there was something of value to take from the Chuko, enabling Winchester to form the intent to rob

them. But, Winchester knew that Chuko agreed to bring $1,800 worth of heroin and thus possessed something of value. Third, Winchester argues that Detective Beld falsely testified about the Chucko's and Scrappy's state of mind that they were going to be robbed. But, robbery does not require the victim to have a particular mental state. See RCW 9A.56.190. Finally, Winchester contends that Detective Beld falsely testified that Winchester approached Chuko and Scrappy in the hallway, suggesting that Winchester took a substantial step toward attempted robbery. But, other testimony corroborates Detective Beld's testimony. Winchester's challenges merit no further review.

## C. Sufficient Evidence

Winchester alleges that there was insufficient evidence to convict him of attempted possession of a controlled substance or attempted robbery. A person is guilty of attempt if, with intent to commit a specific crime, he does any act which is a substantial step toward the commission of the crime. RCW 9A.28.020(1).[6] There is sufficient evidence to support a conviction if, when viewed in the light most favorable to the State, the evidence permits a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Tilton, 149 Wn.2d 775, 786, 72 P.3d 735 (2003).

Winchester argues that the State did not demonstrate a substantial step towards possession of a controlled substance. A substantial step is one that strongly corroborates the actor's criminal purpose. State v. Johnson, 173 Wn.2d 895, 899, 270 P.3d 591 (2012). Winchester offered a specific amount of money he was willing to pay for heroin. He asked

---

[6] In count I and II, Winchester was charged under the Controlled Substances Act, chap 69.50 RCW, not the general attempt statute, RCW 9A.28.020. But, the general attempt statute is applicable to a controlled substance attempt, because the two are not inconsistent. State v. Pineda-Pineda, 154 Wn. App. 653, 668, 226 P.3d 164 (2010).

Lara to contact Chuko. Chuko arrived at the house with drugs a short time later. All the essential elements of the transaction had been arranged. There was sufficient evidence that Winchester took a substantial step towards attempted possession of heroin.

Winchester further argues that the State failed to show that he had the intent to commit attempted robbery. Glyzinski testified that Winchester said, "We're going to shake them down for their money," and "we'll just take their guns." Winchester argues that Glyzinski's testimony was the only evidence of Winchester's intent and that other testimony directly contradicted Glyzinski's statements. Winchester asks us to assess witness credibility. It is the fact finder's job to measure witness credibility. Camarillo, 115 Wn.2d at 71. We do not review that determination on appeal. Id.

D. Double Jeopardy

Winchester argues that the State placed him in double jeopardy when it charged him with both attempted possession of heroin and attempted first degree robbery. We use the Blockburger[7] "same elements" test to determine whether there is a violation of the double jeopardy clause in Constitution article 1, section 9. State v. Gocken, 127 Wn.2d 95, 107, 896 P.2d 1267 (1995). This test examines whether each offense contains an element not contained in the other. Id. at 101.

The statutory provisions under which Winchester was charged do not have the same elements. Attempted possession of heroin requires that the State prove Winchester attempted to obtain a controlled substance. RCW 69.50.4013(1). One of the elements of attempted robbery is that Winchester attempted to obtain the personal property of

---

[7] Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

27

another. RCW 9A.56.190; RCW 9A.28.020. Neither of these requirements is present in the other statute. Winchester was not subjected to double jeopardy.

We remand for the trial court to strike Winchester's term of community custody. We otherwise affirm.

WE CONCUR: