# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| In re the Matter of the Personal Restraint of<br><br>CARRI DARLENE WILLIAMS,<br><br>Petitioner. | No. 77416-6-I<br><br>ORDER DENYING MOTION FOR RECONSIDERATION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

The appellant, Carri Williams, has filed a motion for reconsideration of the opinion filed on September 16, 2019. The respondent, State of Washington, has filed a response. The court has determined that the motion should be denied. However, the opinion should be withdrawn, and a substitute opinion filed. Now, therefore, it is hereby

ORDERED that the motion for reconsideration is denied; and it is further

ORDERED that the opinion filed on September 16, 2019, is withdrawn; and it is further

ORDERED that a substitute opinion shall be filed.

IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) ) ) | No. 77416-6-I |
| CARRI DARLENE WILLIAMS, | ) ) ) | DIVISION ONE |
| Petitioner. | ) ) ) | UNPUBLISHED OPINION |
| | ) | FILED: November 25, 2019 |

ANDRUS, J. — Hana Williams, a teenage girl from Ethiopia, died in her adoptive family's backyard, the victim of physical abuse, inflicted starvation, and hypothermia. A jury convicted Hana's mother, Carri Williams,[1] of homicide by abuse in connection with her death and with assault of a child in the first degree in connection with Carri's abuse of her adopted Ethiopian son, I.W.[2] We affirmed Carri's convictions and sentence in State v. Carri Darlene Williams, No. 71193-8-I (Wash. Ct. App. Dec. 21, 2015) (unpublished), review denied, 185 Wn.2d 1036 (2016)[3] (hereinafter C. Williams).

In this personal restraint petition, Carri challenges both the legal and evidentiary basis for her convictions as well as the adequacy of her trial and appellate counsel's representation. After a thorough consideration of the trial

---

[1] Carri and her husband, Larry, were both charged and were tried together. We refer to them by their first names for convenience. We mean no disrespect.

[2] We refer to Hana by her given name but refer to the adopted son by the initials I.W. because he was a minor at the time of trial.

[3] http://www.courts.wa.gov/opinions/pdf/711938.pdf.

record, the parties' briefing, and oral argument, we deny her personal restraint petition.

## FACTS

In the early hours of May 12, 2011, Carri telephoned her husband, Larry, as he drove home from his job at Boeing. Carri told him that she had found their teenage daughter, Hana, lying face down in the backyard, naked and unconscious. After instructing Carri to call 9-1-1, Larry raced home and helped perform CPR until the medics arrived and transported Hana to Skagit Valley Hospital. Hana was pronounced dead at 1:30 a.m. on May 12, 2011.

A subsequent investigation revealed that Carri and Larry routinely physically and psychologically punished Hana, then a young teen, and I.W., a 9-year-old hearing-impaired boy, both of whom they had adopted from Ethiopia in 2008.

Dr. Daniel Selove, the forensic pathologist who performed Hana's autopsy, noticed that Hana had visible injuries on her pelvis, elbows, knees, and calves; bruises on her knees, eyebrow and upper pelvis; and multiple impact marks on her thighs and calves. He determined that when she died, Hana suffered from severe malnutrition, with an abnormally thin body and protruding ribs and shoulder blades. Dr. Selove identified Hana's cause of death as hypothermia, with malnutrition and a bacterial infection in her stomach, h. pylori,[4] as contributing factors. Dr. Rebecca Wiester, a Board-certified physician in child abuse pediatrics with malnutrition and

---

[4] *Helicobacter pylori* (commonly known as *h. pylori*), is a bacterial infection of the stomach. https://www.mayoclinic.org/diseases-conditions/h-pylori/symptoms-causes/syc-20356171. Dr. Selove indicated the bacteria was present when Hana died but could not confirm whether Hana was actively experiencing symptoms at the time of her death.

hypothermia expertise, confirmed that Hana died from hypothermia brought on by inflicted starvation.

When Child Protective Services (CPS) interviewed I.W. and the Williamses' seven biological children on May 24, 2011, the children revealed that Carri and Larry had regularly beaten I.W. and Hana, causing scars, had denied them food, had forced them to eat sandwiches soaked in water or eat frozen, uncooked vegetables while sitting outside on the back porch away from the family, and had forced Hana and I.W. to sleep in a locked closet or shower room. CPS removed all of the children from the home in July 2011.

On September 9, 2011, the State charged Carri and Larry with homicide by abuse under RCW 9A.32.055 and the alternative crime of first degree manslaughter under RCW 9A.32.060 for the death of Hana, and assault of a child in the first degree under RCW 9A.36.120 for their mistreatment of I.W. On September 9, 2013, following a seven week jury trial, the jury found Carri guilty of all three charges.[5]

On October 29, 2011, the trial court vacated Carri's manslaughter conviction on double jeopardy grounds, and it sentenced Carri to consecutive sentences of 320 months for the homicide by abuse and 123 months for the assault of I.W. We affirmed Carri's convictions and sentence on direct appeal. C. Williams, No. 71193-8-I, slip op. at 2.[6]

---

[5] The same jury found Larry guilty of first degree manslaughter and assault of a child. It could not reach a verdict on Larry's homicide by abuse charge.

[6] This court also affirmed Larry's convictions and sentence. See State v. Larry Paul Williams, No. 71112-1-I (Wash. Ct. App. Dec. 21, 2015) (unpublished), review denied, 185 Wn.2d 1034, 377 P.3d 741 (2016), http://www.courts.wa.gov/opinions/pdf/711121.pdf (hereinafter L. Williams).

In this personal restraint petition, Carri challenges (1) the sufficiency of the evidence to prove either homicide by abuse or manslaughter in the first degree; (2) the constitutionality of the homicide by abuse statute; (3) the prosecutor's statements during opening and closing argument; and the assistance of counsel she received (4) at trial and (5) on direct appeal.[7]

## ANALYSIS

An appellate court may grant relief to a petitioner who is under restraint and who can demonstrate his restraint is unlawful. RAP 16.4; In re Pers. Restraint of Cook, 114 Wn.2d 802, 805, 792 P.2d 506 (1990). Restraint is unlawful when a conviction is obtained in violation of the United States Constitution or the laws of the state of Washington. RAP 16.4(c)(2).

Relief by way of a collateral challenge to a conviction is extraordinary and a petitioner must meet a high standard before this court will disturb an otherwise settled judgment. In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). A petitioner has the burden of demonstrating error and, if the error is constitutional, actual and substantial prejudice. In re Pers. Restraint of Sandoval, 189 Wn.2d 811, 821, 408 P.3d 675 (2018). If the error is not constitutional, the petitioner must show that the error represents a "fundamental defect . . . that inherently resulted in a complete miscarriage of justice." Id. (quoting In re Pers. Restraint of Finstad, 177 Wn.2d 501, 506, 301 P.3d 450 (2013)). Furthermore, a petitioner may not renew an issue that was raised and rejected on direct appeal

---

[7] Carri also attempts to "join[] in the claims presented by Larry Williams in his parallel [petition]." We decline to address Larry's claims here. Carri's petition fails to comply with RAP 16.7(b) to assert claims alleged by Larry in his personal restraint petition.

unless the interests of justice require the issue to be reexamined. In re Pers. Restraint of Pirtle, 136 Wn.2d 467, 473, 965 P.2d 593 (1998).

Claim 1: Conviction for Homicide by Abuse

Carri raises two challenges to her conviction for homicide by abuse. First, she argues that the State presented insufficient evidence to prove she was extremely indifferent to whether Hana lived or died or that she actually knew there was a substantial risk Hana could die from hypothermia. Second, she contends that the trial court erred in failing to define "extreme indifference to human life" for the jury in violation of article IV, section 16 of the Washington state constitution.

(a) Sufficiency of the Evidence

The due process clauses of both the state and federal constitutions require the State to prove each element of the crime charged beyond a reasonable doubt. State v. Mau, 178 Wn.2d 308, 312, 308 P.3d 629 (2013). When a party challenges the sufficiency of the evidence, this court reviews the evidence in the light most favorable to the prosecution. Id. The evidence is sufficient when any rational trier of fact could have found the essential elements beyond a reasonable doubt. State v. Baeza, 100 Wn.2d 487, 490, 670 P.2d 646 (1983).

Under RCW 9A.32.055:

A person is guilty of homicide by abuse if, under circumstances manifesting an extreme indifference to human life, the person causes the death of a child or person under sixteen years of age . . . and the person has previously engaged in a pattern or practice of assault or torture of said child [or] person under sixteen years of age.

The jury was instructed that in order to convict Carri of homicide by abuse, it had to find beyond a reasonable doubt that: (1) on or about May 12, 2011, Carri

or her accomplice acted under circumstances manifesting an extreme indifference to human life; (2) that Hana died as a result of her acts or the acts of an accomplice; (3) that Hana was under 16 years of age; (4) that Carri or her accomplice previously engaged in a pattern or practice of assault or torture of Hana; and (5) any of the acts occurred in Washington.

1. Circumstances Manifesting an Extreme Indifference to Human Life

Extreme indifference to human life may be proved by evidence of "an aggravated form of recklessness" falling below a specific intent to kill. State v. Adams, 138 Wn. App. 36, 50, 155 P.3d 989 (2007) (quoting State v. Dunbar, 117 Wn.2d 587, 593, 817 P.2d 1360 (1991)). The State may prove this element by demonstrating that a defendant has engaged "in extremely reckless conduct that creates a grave risk of death." Id. at 50. The *mens rea* of homicide by abuse requires evidence that the defendant demonstrated indifference toward a particular victim, rather than to human life in general. State v. Edwards, 92 Wn. App. 156, 163, 961 P.2d 969 (1998). Evidence that a defendant engaged in a pattern or practice of assaulting a child is sufficient to demonstrate an extreme indifference to that child's life. Id. at 165.

We conclude that the State established that Carri acted under circumstances manifesting an extreme indifference to whether Hana lived or died, both in the months leading up to, and on the day of her death. At trial, I.W., who was 12 at the time of trial, and six of the Williamses' biological children, spanning in ages from 13 to over 18, described the circumstances under which Carri acted toward Hana preceding her death, from which a reasonable jury could conclude

Carri placed Hana at risk of death and simply did not care whether she lived or died.[8]

The Williams children described their parents' chosen methods of punishing Hana physically and psychologically for what they called her "disobedient" behavior. Jacob saw Carri spank Hana with "switches"[9] at least once every day in the last six months of her life. Carri, who home-schooled all nine children, also instructed her eldest sons to beat Hana when she deemed Hana to be "defiant." This physical punishment at times included beating Hana on the bottom of her feet, treatment her brother, I.W., experienced and described as "very painful." Hana's elder brother Jacob testified that the intent of this corporal punishment was to inflict pain.

The Williams children and their parents provided consistent descriptions of Hana's quotidian living conditions. When Hana first arrived from Ethiopia, she slept in a bedroom with her sisters. When Carri and Larry caught Hana stealing food, they forced her to sleep outside in a barn. For a two week period in the fall of 2010, they locked Hana in a shower room at night without access to a toilet. For the last six months of Hana's life, Carri and Larry locked her into a small closet every night.[10] Hana had to remain in this closet until either Larry or Carri let her

---

[8] Four of Carri's sons all have the same initials—J.W. To avoid confusion, we refer to the two eldest sons by their given first names, Joshua and Jacob, because they were both over the age of 18 at trial. We will refer to her other two sons as the third and fourth biological sons. The two daughters who testified will be referred to as C.W., age 14 at trial, and S.W., age 13 at trial.

[9] The Williamses used a plastic plumbing tube and glue stick to strike the children, referred to by the children as "switches."

[10] The closet measured 2 feet by 4 feet, 3 inches. Hana was 5 feet tall.

out, and she had no ability to turn on the light while inside because the switch was on the outside of this closet.

Moreover, Carri forced Hana to stay in the closet all day if she refused to follow Carri's instructions to go outside. One of Carri's younger sons testified that Hana was locked in the closet for up to 24 hours at a time. When Carri locked Hana inside the closet during the daytime, she played an audiobook of the Bible because, as one of the Williams children put it, Carri "was trying to get Hana's brain to think differently."

Larry and Carri also made Hana use an outhouse behind the barn, and wash her hands and shower outside in the backyard, and would not permit her to use any of the three indoor bathrooms in the home. Carri began imposing this punishment in the summer of 2010 because Hana suffered from a "blood-borne disease,"[11] had started menstruating, and, Carri suspected, was deliberately smearing blood on the bathroom walls and door. Carri regularly escorted Hana to and from the backyard outhouse, which Hana was the only child forced to use. I.W. was unsure why Larry and Carri would hose Hana off in the backyard with cold water, but he could see that "she wasn't comfortable" when being hosed down. Carri also decided at one point to cut off all of Hana's hair in punishment for having cut the grass too short.

The Williamses also used food deprivation as a form of punishment. Carri and Larry forced Hana and I.W. to miss meals, with Hana sometimes being denied

---

[11] Hana contracted Hepatitis B in Africa and received treatment for it after she was adopted by the Williamses. The entire Williams family received the Hepatitis B vaccine before Hana arrived in 2008.

any food for two consecutive days. When they did provide food to eat, they required Hana and I.W. to eat separately from the rest of the family. The parents forced both Hana and I.W. to eat on the floor, in another room, or outside, when the rest of the family ate at the dining room table. Carri often required Hana to eat her meals in the locked closet. In the last few months of Hana's life, Carri and Larry forced both Hana and I.W. to eat their meals outside for what Carri described as "meal time oppositionality." Carri testified that as time went on, Hana ate most meals outside on the back patio.

Moreover, when Hana and I.W. received meals, they were not fed the same food as the other Williams children. Instead, the lunch sandwiches that Hana and I.W. received had been soaked in water by either Larry, Carri, or one of the other children at their parents' direction. Carri testified that the children were fed these "wet sandwiches" because Hana and I.W. refused to cooperate at the meal table. Dinnertime was no different. Carri usually served Hana and I.W. cold leftovers topped with un-defrosted frozen vegetables. Hana went from a weight of 108 pounds and a base metabolic index (BMI) of 23.46 in April 2009, to 78 pounds, and a BMI of less than 16, signifying severe malnutrition, on the day of her death in May 2011.

Carri's physical punishment followed Hana to the backyard. Carri forced Hana to engage in punishments she and the children called "walk[ing] the line" and "boot camp." "Walk[ing] the line" involved forcing Hana to walk the perimeter of an outdoor pickle ball court in the backyard. "Boot camp" involved extra chores, usually outdoors, and sometimes involved stacking and restacking the same pile

of rocks. Hana underwent "boot camp" at least once or twice a week in the last six months of her life.

May 11, 2011, began as a typical day for the Williamses. While the children emerged from their bedrooms, Carri let Hana out of the locked closet. Then Larry, with C.W. and S.W.'s assistance, prepared breakfast around 10:00 a.m. Given that Larry admitted that Hana ate breakfast outside "more often than not," she likely ate her breakfast outside that morning.

After breakfast, the children cleaned up the kitchen, did their chores, and went outside to play. The children recalled playing "Capture the Flag" that morning. Hana, who was wearing a t-shirt and sweat pants, was outside but did not participate. Larry left for work around noon.

The children typically ate lunch between 2:00 or 3:00 p.m. Carri escorted Hana to the outhouse before lunch. She then gave Hana her lunch, presumably a wet sandwich, around 3:00 p.m. Although Carri initially denied forcing Hana to remain outside as punishment that day, she admitted she forced Hana to eat outside "for disobedience, being oppositional." And one of Carri's sons confirmed that Hana was required to stay outside all day as punishment. There was also testimony that Carri refused to let Hana remain indoors when she was menstruating, and that Hana got her hands bloody because she was "spotting" that day.

Carri testified that around 4:00 or 4:30 p.m., she told Hana to come back inside, presumably to do her schoolwork, but that Hana would not comply. Carri

saw Hana remove her shoes and stand at the back door. Carri shut the door on Hana.

Carri testified that initially she checked on Hana every five to ten minutes after Hana refused to come inside after lunch. She saw Hana put her shoes back on but had no recollection of what Hana did between 4:30 and 6:00 p.m., when Carri again walked Hana to the outhouse. Carri claimed she again told Hana to come inside and Hana again refused. By that time, it had started to drizzle outside. At some point before it got dark, Carri went outside and spanked Hana with a switch.

Carri escorted Hana to the outhouse a third time around 8:30 p.m. But this time, Carri saw Hana "throw herself down" on the ground. Carri testified that Hana took a few steps and lunged forward, landing on her hands and knees. She further testified that Hana did this repeatedly before and after using the outhouse. Carri took no steps to help Hana get up after falling because "I didn't need to. She got right back up herself." Carri also saw Hana repeatedly hit her forehead on the back patio. At that point, Carri chose to leave Hana outside because she "couldn't watch it anymore."

After Carri returned inside, she saw Hana continue to "throw herself" around for another 20 to 30 minutes. One of Carri's sons testified that he observed Hana's odd behavior as well. Carri noticed by this time that Hana had skinned her elbows and knees and had a "knot" on her forehead.

Carri claims she sent her oldest son, Joshua, outside to bring Hana inside, but she also instructed Joshua to spank Hana with the plastic switch and to force

- 11 -

Hana to do exercises, like jumping jacks or sit-squats, to keep warm. Hana began exercising as Joshua instructed, but when she stopped, Carri sent her next eldest son, Jacob, to do the same thing. Jacob testified that he spanked Hana with the plastic switch and ordered her to do sit-squats. Again, Hana complied for about a minute, then stopped. Finally, Carri sent her third oldest son outside to repeat the beatings. Carri admitted that she wanted Hana to do exercises "to keep warm."

Dr. Selove testified that when he conducted Hana's autopsy, he observed marks on Hana's left thigh where she had been struck by a long, narrow object, such as a strap or switch at least four times with sufficient force to cause her blood vessels to burst. He found ten similar patterned bruises on Hana's lower calves.

Carri claimed that she then took Hana her dinner outside. Carri said Hana did not eat the food; Hana brought the fork to her mouth as if she was going to take a bite and then put the fork back. In a written statement to police, one of Carri's sons said that Hana was leaning over the table and was unable to eat. After five minutes, Carri took Hana's dinner plate away and moved it into the house.

Carri said at some point, she attempted to carry Hana inside but Hana "went limp." She then ordered Jacob and Joshua to carry Hana inside. Carri told the boys to first don latex gloves and to remove Hana's shoes and socks because they were soggy from dripping water and Hana's blood. Carri said Hana was so bloody and her clothes so wet from walking in the rain, that "[t]he water dripping down had made the blood drip down all over her soft-centered shoes," and she wanted them removed before Hana came inside. Joshua complied, removing Hana's shoes and socks and throwing them in the garbage. Jacob testified that when Joshua

returned to the back porch, Hana started taking off her clothes. Carri went outside and saw Hana sitting "buck naked from the waist down." Carri told her sons to go back inside and to "forget it" because "modesty is important in our family." Carri took a set of dry clothes to Hana, told her to get out of her wet clothes, returned back inside, and turned the patio light off, leaving Hana in the dark. Carri testified that she checked on Hana twice, turning on and off the patio light each time. At some point, she thought Hana had begun changing her clothes.

But Carri was "busy" with her other children, so she instructed C.W. to check on Hana. C.W. testified that she checked on Hana every 10 to 15 minutes and saw that Hana continued to remove more clothing, until she was completely naked. Like Carri, C.W. turned on and off the light every time she checked on Hana.

Hana apparently remained outside in the dark, bloody, wet, cold, and naked for at least two hours. Around midnight, Larry called Carri to let her know that his vanpool had dropped him off at the park and ride, and that he was on his way home. When Carri told Larry about her perception of Hana's behavior, Jacob overheard them arguing about whether Hana was really falling down on purpose. Larry was not at all surprised by Carri's description of Hana's behavior.

C.W. next saw Hana face down on the back patio. C.W. told Carri, who went outside, to find Hana with her face halfway on the concrete and half on the grass, and her mouth full of dirt from having her face fall onto a mole hill just off the patio. Hana was cold to her touch. Carri rolled her over and "could see that it wasn't good." She ran inside to grab a sheet from the linen closet to cover Hana "for modesty," and then tried to carry her inside with C.W.'s help. When Carri

- 13 -

realized they could not carry Hana, Carri enlisted Joshua's help. Joshua came outside and carried Hana inside.

Once Hana was inside, neither Carri nor Joshua could find a pulse. Carri called Larry who told her to call 9-1-1. The 9-1-1 operator directed Carri to perform CPR. When Larry arrived home shortly thereafter, he and Carri took turns administering CPR until medics arrived.

When Skagit County Sheriff Deputy Chad Clark arrived, he saw a large lump on Hana's forehead. Pictures taken of Hana's body showed her contusions, abrasions, and dirt above Hana's right eye and in her right nostril. Hana was transported to Skagit Valley Hospital where Dr. Janette Tomlinson pronounced her dead at 1:30 a.m. on May 12, 2011. Dr. Tomlinson did a full examination of Hana's body and also saw contusions on her forehead, bruises and abrasions on her hips, knees, and shins, and red streaks on her thighs. Carri told Dr. Tomlinson that Hana had been "face planting" outside that night. She found this version of events odd, given that it would be inconsistent with the normal human reflexive response to a fall. "[I]f you try to fall down and hit your nose, if you are standing on flat ground and you just try to fall to the ground, your hands usually protect you from falling." Had the police and CPS not already been involved, Dr. Tomlinson testified she would have notified CPS.

The State's experts testified that Hana's behavior before and on May 11, 2011, can be explained by the fact that she was so severely malnourished. Dr. Wiester testified that starvation causes distress and anxiety in a child, leading the child to steal food, to exhibit abnormal behaviors around food, and to engage

in defiant behaviors in general. Dr. Frances Chalmers, a pediatric medical consultant for the State, testified that when a body lacks adequate fuel in the form of calories, and it starts using stored body tissue, the result can be irritability, behavioral changes, fatigue, and serious cardiac arrhythmia. Both Dr. Chalmers and Dr. Wiester testified that a child as emaciated as Hana would be more susceptible to hypothermia because she would have insufficient insulating fat under the skin to keep the body warm in a cool environment. And Dr. Wiester noted that people suffering from hypothermia exhibit erratic physical movements, such as stumbling or having difficulty walking, and irrational behavior from an altered mental status. Dr. Selove noted hypothermia victims often have a false sensation that they are warm and engage in "paradoxical undressing," meaning they remove their clothing even though one would expect them not to in that situation. Ultimately, an individual suffering from severe hypothermia will lapse into a coma.

Carri argues this evidence does not establish she acted with extreme indifference to whether Hana lived or died and that her testimony indicated that she "did everything she could think of to get [Hana] to come out of the rain and into the house." But there was substantial testimony indicating otherwise. The jury was not obligated to accept Carri's testimony. When a defendant alleges insufficiency of the evidence, we view the evidence in the light most favorable to the State. State v. Green, 94 Wn.2d 216, 221, 616 P.3d 628 (1980).

Here, a reasonable jury could conclude from the evidence that Carri did not care that she was starving Hana to death. Carri complained to her knitting club

friends that if Hana would not eat what was put in front of her, then she would not eat at all. Carri denied Hana food or made the food unpalatable to eat and forced her to eat it away from the rest of the family. Carri testified Hana then began stealing food about a year before her death. And Carri said Hana lied about stealing when confronted. Carri told friends that Hana was a "liar" who "rifled through everyone's belongings and stole from them." Carri locked Hana in the shower room and then the closet to keep her from "hoarding" or "gorging on sweets." When one of her friends suggested she return Hana to the adoption agency, her response was "I don't wish her on anyone."

Moreover, Carri admitted she never sought advice from any medical or psychological professional for what she deemed to be Hana's "revealed rebelliousness." She simply saw no cause for concern for Hana's health. In fact, the Williams family doctor, Harold Clark, testified the last time he had seen Hana was in April 2009, over two years before her death.

Dr. Wiester testified that this pattern of restricting Hana's food intake, punishing her for "bad behavior" by not allowing her to eat, confining her to a locked closet, isolating her from her family, and forcing her to be punished by other members of the family, are all actions consistent with the "intentional infliction of starvation." She testified:

> [C]hildren who have inflicted starvation begin with having restricted food or having bad food or no food or food different from the rest of the family or bread and water or something like that, and then the pattern of the behavior which is very commonly seen is that the kids start to steal food, they start to lie about food, they start to hoard food, they start to take other people's food, and then the problem becomes that is seen as bad behavior which then sort of spirals into more disciplinary approaches and more restriction and more treatment for

- 16 -

bad behavior and being disagreeable and disobedient. So then there's even more restriction and then it sort of becomes a self-fulfilling prophecy . . . .

On the day of Hana's death, Carri removed her from a locked closet, forced her outside, either because Hana was rebellious or because she was menstruating, probably forced her to "walk the line" or stack rocks while outside, then physically beat her, ordered her three eldest sons to beat her, and forced her to do jumping jacks or squats. Carri then saw Hana fall to the ground and sustain multiple injuries, including a significant trauma to her head. Yet, Carri did nothing either to stop what may have been intentionally self-harming behavior or to determine what may have been the cause of her erratic physical movements. Carri offered cold food to Hana for dinner but then promptly took it away when Hana lacked sufficient body coordination to actually get the fork to her mouth. And after learning that Hana was naked, bloody, possibly concussed, cold and wet, Carri left Hana sitting on the back porch. The jury could reasonably find Carri passively stood by while Hana slipped into unconsciousness from starvation and exposure because she simply did not care whether Hana lived or died.

2. Sufficiency of Evidence of Carri's Knowledge of the Risk of Death

Carri next argues that under State v. Dunbar, 117 Wn.2d 587, 817 P.2d 1360 (1991), the State had to prove she had actual knowledge that her conduct presented a substantial risk of death by hypothermia, rather than proving she acted recklessly and caused a death. In Dunbar, the Supreme Court analyzed whether one could be charged with attempted first degree murder under RCW 9A.32.030(b), the elements of which are:

- 17 -

> Under circumstances manifesting an extreme indifference to human life, he or she engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person . . .

The Supreme Court held that this crime is "an aggravated form of recklessness which falls below a specific intent to kill." 117 Wn.2d at 593. "[T]he phrase 'extreme indifference' appears to contemplate a lesser mental state" than intent. Id. And if the crime does not require proof of a specific intent to kill, the court held that the defendant could not be convicted of attempting to commit that crime. Id. at 594-95.

Carri contends Division Three extended Dunbar's construction of the first degree homicide "extreme indifference" statute to a homicide by abuse case, State v. Adams, 138 Wn. App. 36, 155 P.3d 989 (2007). In that case, the court, in evaluating the sufficiency of evidence, cited Dunbar for the proposition that extreme indifference to human life "may be proved where the defendant engages in extremely reckless conduct that creates a grave risk of death." Id. at 50. Carri argues that because recklessness is statutorily defined in RCW 9A.08.010(1)(c) as requiring proof that a defendant "knew of and disregarded a substantial risk;" and Adams and Dunbar require proof of a grave risk of death, the State must prove that Carri had actual knowledge that her conduct put Hana at a risk of death.

She contrasts Adams with Division Two's decision in State v. Madarash, 116 Wn. App. 500, 512, 66 P.3d 682 (2003), in which that court rejected the argument that the definition of "extreme indifference" from the first degree murder statute applies to the homicide by abuse statute. The Madarash court noted that the homicide by abuse statute did not incorporate the language "conduct which

creates a grave risk of death" from the first degree murder statute. 116 Wn. App. at 512. It held that "Madarash did not have to know or understand the physiological response, or any other results, that [the child] might endure from drinking a 48-ounce Diet Pepsi and ingesting great quantities of water in the bathtub. Rather, in order to have acted with extreme indifference to [the child's] life, Madarash simply had to not care whether [the child] lived or died." Id.

Carri asks this court to adopt the higher "actual knowledge" *mens rea* of Adams and to reject what Carri characterizes as a lower *mens rea* standard of Madarash. We do not need to resolve this legal issue here, however, because we conclude the evidence is sufficient to prove that Carri knew that intentionally starving Hana and exposing her to inclement weather for hours in inadequate clothing created a substantial risk of death.

First, Carri had full knowledge she was mistreating Hana. She testified she knew it was wrong to lock Hana in a closet or shower room. She admitted it was a mistake to force Hana to sleep in the barn, to force her to shower outside, and to force her to use an outhouse. And she knew that law enforcement would be asking questions about her role in Hana's death, so she told her children to lie to the police and to child protective services as to where Hana slept at night.

Second, while Carri insisted she had never been trained in or had any knowledge of the symptoms of hypothermia, Carri admitted that "as a common sense kind of thing, as a mother," she knew "being outside in the cold rain is problematic." She knew it was harmful for children to be outside when it is wet and cold. She testified that around 8:30 p.m., she became afraid that Hana was too

cold and wet so she reached under Hana's shirt at one point and confirmed her body felt warm. Her conduct appears to conflict with her statement that she had no clue that hypothermia was a risk. And Carri also told Skagit County Sheriff Detective Ben Hagglund that Hana's body was cool—not warm—to the touch and this fact scared her. Finally, Carri's third eldest son testified he knew what hypothermia was because he had watched a movie about it during a hunting safety class. He was aware that people, when suffering from hypothermia, may begin to feel very hot and remove their clothing. On the night of Hana's death, he was watching Hana from the windows in the house, along with Joshua and Jacob and his sister, C.W. And he thought Hana was cold. From this evidence, the jury could have reasonably concluded that Carri was aware Hana was descending into hypothermia that night.

Third, the jury could have reasonably concluded that Carri's testimony about regularly feeding Hana was untrue. Carolyn Roesler, an Australian doctor who provided medical care to Hana while she was in the Ethiopian orphanage, testified Hana was healthy with no evidence of malnutrition before leaving for the United States. Carri knew Hana was losing weight but claimed it was "gradual." Dr. Chalmers testified Hana's weight loss was "precipitous." She described the pictures of Hana at death as "quite emaciated." Dr. Selove testified her ribs were visible and her shoulder blades protruded. Dr. Wiester testified the photographs of Hana after death showed visible signs of temporal wasting, which she described as the loss of fat around the eyes making her look like an older person.

Carri testified that when Hana first joined their family, she gained weight rapidly and "grew out of her clothing." Joseph denied ever telling a foster mother, Trudy Wise, that the family took food away from Hana because she had gotten fat, but Wise confirmed his statement to her. Joseph was certainly aware Hana was losing weight. Several family members, including Carri, repeatedly stated that Hana had been stealing food, a psychological effect of starvation. Carri freely admitted she locked Hana in the shower room and closet to prevent her from stealing food. The jury could conclude from this evidence that Carri was intentionally starving Hana and that she knew she was creating a risk of death by doing so.

The record here is sufficient to prove beyond a reasonable doubt that Carri knew of and disregarded a substantial risk of death by intentionally starving her child and forcing her to remain outside in inadequate clothing, and then naked, in the rain for an extended period of time.

(b) Lack of Instruction Defining "Extreme Indifference to Human Life"

Carri next claims that her homicide by abuse conviction must be reversed because the trial court failed to define the term "extreme indifference to human life," in violation of State v. Allen, 101 Wn.2d 355, 678 P.2d (1984) and article IV, section 16 of the Washington State Constitution. We disagree.

At trial, Carri proposed an instruction defining "extreme indifference to human life." The proposed instruction, based on Madarash and State v. Edwards, 92 Wn. App. 156, 961 P.2d 969 (1998), read: "'Extreme indifference to human life' means to not care whether the deceased lived or died." The trial court declined to

give this particular instruction, reasoning that the definition was not as simple as counsel had reduced it to in the proposed instruction based on the court's reading of Madarash. It concluded that an ordinary person could figure out what "extreme indifference to human life" means.

On direct appeal, this court addressed the definition of "extreme indifference to human life" when it rejected Carri's argument that the phrase was unconstitutionally vague. C. Williams, No. 71193-8-I, slip op. at 16. We recognized that the homicide by abuse statute does not define "extreme indifference." But, citing the dictionary definitions of these terms and the court's adoption of the dictionary definitions in Madarash, we concluded that the plain meaning of the term set an ascertainable standard of guilt that was not inherently subjective as applied to Carri's conduct. Id. at 17-18.

In her petition, Carri argues that because "extreme indifference to human life" is a technical term for the applicable *mens rea*, she was entitled to an instruction defining that term for the jury. Due process requires that, when read as a whole, jury instructions in a criminal case must correctly tell the jury the applicable law, must not be misleading, and must permit the defendant to present her theory of the case.[12] State v. O'Hara, 167 Wn.2d 91, 105, 217 P.3d 756 (2009). While the constitution requires that the jury be instructed as to each element of the offense charged, the failure to further define one of those elements is not within

---

[12] Carri cites no support for the proposition that article IV, § 16 provides any greater protection than the due process clause of the state or federal constitutions.

the ambit of the constitutional rule. Id. Thus, the trial court's refusal to define "extreme indifference to human life" would not rise to a due process violation.

Carri relies on Allen for her claim that a definition is constitutionally required. In Allen, the defendant sought an instruction defining the word "intent," an element of the charged crime of attempted second degree burglary. 101 Wn.2d at 358. Our Supreme Court stated that when the Legislature passed RCW 9A.080.010 to establish a hierarchy of mental states for crimes of increasing culpability, it intended to give these mental states technical meanings, as opposed to their commonly understood meanings. Id. at 359. Because the crime of second degree burglary included the specific mental state of an intent to commit a crime, it concluded that the trial court erred in rejecting the defendant's proposed statutory definition of intent. Id. "Although the jurors may be able to hammer out a definition for intent and knowledge among themselves, it cannot be assumed that these definitions would match those established by the Legislature for use at trial." Id. at 362.

But Allen did not rest on due process principles; it instead relied on a determination that the statutory term "intent" was a technical term of art. Unlike in Allen, there is no statutory definition of "extreme indifference to human life," and the court in Madrash and this court in C. Williams determined the statutory phrase is not in fact a technical term of art.

Moreover, in State v. Barstad, 93 Wn. App. 553, 970 P.2d 324 (1999), the court rejected the defendant's argument that the trial court should have defined "extreme indifference to human life" as used in the murder statute. Id. at 566. The

court recognized that as a general rule, the trial court must define technical terms and expressions, but it need not define words or expressions that are of ordinary understanding or self-explanatory. Id. at 567 (internal quotation marks omitted) (quoting State v. Brown, 132 Wn.2d 529, 611-12, 940 P.2d 546 (1997)). It reasoned that:

> [T]he Legislature substituted the term 'extreme indifference' for the antiquated 'evincing a depraved mind' terminology of the prior law for the purpose of updating the code with modern language. . . . the courts have not attempted to further define 'extreme indifference'; rather, the particular facts of each case are what illustrate its meaning. There is no need for further definition.

Id. The phrase "extreme indifference to human life" is a phrase of ordinary understanding. Thus, Carri was not entitled to a definitional instruction as a matter of law under Allen.[13]

Carri separately argues the trial court violated article IV, section 16 by failing to give her proposed definitional instruction. Article IV, section 16, entitled "Charging Juries," provides "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." The purpose of this provision is to prevent the jury from being influenced by the judge's opinion of the evidence that has been presented. City of Kirkland v. O'Connor, 40 Wn. App. 521, 523, 698 P.2d 1128 (1985). Our Supreme Court has construed the latter requirement for judges to "declare the law" in a very general way. Hiscock v. Phinney, 81 Wash. 117, 123, 142 Pac. 461 (1914). This constitutional provision merely requires that the court, and not a jury decide questions of law arising at

---

[13] Because we conclude Carri was not entitled to the definitional instruction she proposed, we need not address her contention that her appellate counsel provided ineffective assistance of counsel in failing to raise this argument on Carri's direct appeal.

trial. Pepperall v. City Park Transit Co., 15 Wash. 176, 183, 45 Pac. 743 (1896). It does not provide an independent ground for challenging a conviction if the trial court's jury instructions otherwise met the requirements of due process.

Because Carri was not legally entitled to an instruction defining "extreme indifference to human life," she has not demonstrated that the trial court's rejection of her proposed instruction requires a reversal of her homicide by abuse conviction. We thus reject Carri's Claim 1.

### Claim 2: Constitutionality of the Homicide by Abuse Statute

Carri contends the homicide by abuse statute is unconstitutionally vague because it fails to give notice of what types of parental discipline are prohibited. In her direct appeal, Carri raised a nearly identical argument, where she claimed that the terms "torture" and "extreme indifference to human life" in the homicide by abuse statute were unconstitutionally vague as applied to her. This court rejected her vagueness argument.[14]

In this petition, Carri characterizes her current vagueness challenge as a *facial*, rather than an *as-applied*, challenge to the statute. To succeed on a facial challenge, the complaining party must demonstrate that the law is impermissibly vague in all of its applications. Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982); State v. Worrell, 111 Wn.2d 537, 541, 761 P.2d 56 (1988). A facial challenge must be rejected if there are any circumstances where the statute can constitutionally be applied.

---

[14]This court followed the reasoning in State v. Brown, 60 Wn. App. 60, 802 P.2d 803 (1990) and State v. Russell, 69 Wn. App. 237, 848 P.2d 743 (1993) to conclude that neither the term "torture," nor the phrase "pattern or practice of assault or torture" in the homicide by abuse statute was unconstitutionally vague. C. Williams, No. 71193-8-I, slip op. at 16.

Washington State Republican Party v. Washington State Pub. Disclosure Comm'n, 141 Wn.2d 245, 282 n.14, 4 P.3d 808 (2000).  Carri does not argue that the homicide by abuse statute is impermissibly vague in all of its applications.  She instead challenges the statute only in the context of parental discipline.  This is in essence an as-applied challenge.[15]

A petitioner may not renew an issue that was raised and rejected on direct appeal unless the interests of justice require the issue to be reexamined.  Pirtle, 136 Wn.2d at 473.  Because Carri raised, and this court rejected, her as-applied challenge to the homicide by abuse statute, and she advances no reasons for why the interests of justice require us to revisit the decision, we will not address this constitutional argument anew.[16]  We thus reject Carri's Claim 2.

### Claim 3: Prosecutorial Misconduct

Carri claims that she was deprived of her constitutional right to a fair trial after the prosecutor committed two instances of misconduct: once during closing argument and once during the rebuttal closing argument.

"The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution." In re Glasmann, 175 Wn.2d 696, 703, 286 P.3d 673 (2012).  Prosecutorial misconduct may deprive a defendant of her right

---

[15] Carri argues that facial challenges in non-First Amendment cases are permissible under Chicago v. Morales, 527 U.S. 41, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999), and that the contrary holding in Seattle v. Montana, 129 Wn.2d 583, 919 P.2d 1218 (1996) is no longer good law.  We do not need to address this contention because we conclude that Carri's challenge, although designated as a facial one, does not fit into that analytical framework.

[16] Carri also challenges the sufficiency of the evidence supporting the jury's finding of guilt on manslaughter in the first degree.  Because we affirm the homicide by abuse conviction, we need not reach any issues relating to the vacated manslaughter conviction here.

to a fair trial. Id. at 703-04. This court reviews constitutional issues de novo. State v. Enquist, 163 Wn. App. 41, 45, 256 P.3d 1277 (2011).

To prevail on a claim of prosecutorial misconduct, "the defendant must establish both improper conduct by the prosecutor and prejudicial effect." State v. Pirtle, 127 Wn.2d at 672. "Prejudice is established only if there is a substantial likelihood the instances of misconduct affected the jury's verdict." Id. Furthermore, unless the statements are "flagrant and ill-intentioned," and the prejudice resulting could not be cured by instructions or admonitions, failure to make a timely objection waives any objection to such statements. State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990). Comments are prejudicial if there is a "substantial likelihood the misconduct affected the jury's verdict." Brown, 132 Wn.2d at 561. "A prosecuting attorney's allegedly improper remarks must be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." Id. A prosecutor "has wide latitude to argue reasonable inferences from the evidence." State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d 43 (2011).

(a) Closing Argument

First, Carri asserts the prosecutor misstated the evidence by arguing that it took "10 to 15 minutes" for Carri to bring Hana into the house and call 9-1-1. During closing argument, the prosecutor said: [17]

> [Carri] goes out there, turns [Hana] over, sees she's not breathing,
> or breathing very little. So what's the first thing [Carri] thinks about

---

[17] Carri characterized this statement as asserting that Carri waited 10 to 15 minutes before bringing Hana inside the house. We do not believe this is a fair characterization of the prosecutor's argument. We understand the argument to reflect the time lapse between C.W. reporting Hana's collapse and Carri's telephone call to 9-1-1.

doing? Call 911? Get her in where it's warm? I got to run in and get a sheet so I can cover her up. When I get her covered up, then I will call for the boys, and they can help me. Now, boys, if this sheet happens to fall off when we're trying to take her in the house, don't you look. Doesn't matter how sick your sister is.

Then she gets in the house, they finally get her into the house, they finally call 911, probably ten, fifteen minutes after it's reported, because of the modesty, because they should have had her in before, and so she dies at the hospital, they pronounce her dead . . . .

Although Carri's counsel did not object to these statements, during Carri's closing, she responded to this factual argument:

The prosecutor talked about, well, that Ms. Williams was just so concerned about modesty that she, you know, waited ten to fifteen minutes before calling 911 because she had to cover Hana up with a sheet. That is not the evidence. The evidence is that she went in the house quickly, she got a sheet that was located nearby, she went outside and she covered Hana up. There's no testimony that took any ten to fifteen minutes. There's no way that it could take ten to fifteen minutes. It doesn't indicate an extreme indifference [to] human life because she wanted to cover her daughter's naked body.

Here, the prosecutor stated that "probably" ten to fifteen minutes passed from the time C.W. first alerted Carri to Hana's condition on the back patio to the time Carri summoned medical aid by calling 9-1-1. This argument was a reasonable inference from the evidence. C.W. testified, and Carri confirmed, that C.W. told Carri about Hana having collapsed, the two of them went outside, Carri turned Hana over to check on her condition, enlisted C.W.'s help to try to lift Hana and move her inside, then ran to find a sheet to cover Hana's naked body, and called to Joshua and Jacob to help carry Hana into the kitchen. Once inside, Carri and Joshua both tried to find a pulse. Carri then called Larry to alert him to Hana's condition. Only after these events did Carri hang up and call 9-1-1. While it may

- 28 -

have taken Carri only a few seconds to find a sheet and return with it to cover Hana's body, the jury could reasonably infer from the testimony that Carri allowed precious minutes to lapse before actually calling 9-1-1 because she was more worried that her teenage sons would see the naked body of a girl than she was for Hana's well-being.

Carri relies on State v. Rose, 62 Wn.2d 309, 382 P.2d 513 (1963), and State v. Reeder, 46 Wn.2d 888, 285 P.2d 884 (1955), to support her claim that the statement was unsupported in the evidence and unduly inflammatory. Neither case is analogous. In Rose, the prosecutor called the defendant a "drunken homosexual" even though there was no evidence that the defendant was drunk. 62 Wn.2d at 313-14. While there was evidence that the defendant was homosexual, the prosecutor's use of the phrase "drunken homosexual" was not to sum up the evidence but was instead intended as a degrading description of the defendant. Id. The prosecutor's comment about the duration of time Carri waited to summon medical aid is not analogous to the degrading, and unsupported, description of the defendant in Rose.

In Reeder, the prosecutor made repeated statements that the defendant threatened his wife with a gun. 46 Wn.2d at 891-92. But there was "not one word of testimony in the record that the defendant threatened his first wife with a gun." Id. at 892. Again, while there was no direct evidence as to the amount of time it took Carri to call 9-1-1, there was sufficient circumstantial evidence to support the prosecutor's inference.

- 29 -

Carri argues that the reference to the passage of time during closing was extremely prejudicial because the duration of this trial made it unlikely the jurors would be able to recall all the testimony. But the trial court provided each juror with a notepad and a pen and it encouraged them to take notes during the witnesses' testimony. They were also instructed to ignore any arguments by the lawyers that were not supported by the evidence. We assume jurors follow this instruction and disregard unsupported arguments. State v. Russell, 125 Wn.2d 24, 84-85, 882 P.2d 747 (1994). Even if the prosecutor's statements could not be characterized as a reasonable inference from the evidence, Carri cannot demonstrate prejudice from this comment, particularly given that her own counsel disputed the factual basis for it in closing argument.

(b) Rebuttal Closing

Second, Carri argues that the prosecutor misstated the law during rebuttal by arguing that the jury could find she acted with extreme indifference to Hana's life based on her mistreatment of Hana over a several year period, rather than limiting the "extreme indifference" period to Carri's actions on May 11 and 12, 2011. We reject this argument as well.

During the State's rebuttal argument, the prosecutor stated:

Now, let's talk for a minute about extreme indifference, because that's what the state needs to prove beyond a reasonable doubt for the homicide charge. Extreme indifference means you just don't care.

How do you decide if Mr. and Mrs. Williams just didn't care? And the way you decide is the same way you decide what other people are thinking. You look at how they're acting. Not just the day that Hana died, but throughout the entire time frame that Hana Williams was being starved and deprived of food and the basic necessities of life.

- 30 -

Carri did not object to this statement.

Instruction 8, the "to convict" instruction for homicide by abuse, provided, as the first element, that "on or about May 12, 2011, the defendant, Carri Williams, or her accomplice, acted under circumstances manifesting an extreme indifference to human life . . .." Carri argues that because the State charged this crime as having occurred "on or about May 12, 2011," the State had to establish a manifestation of extreme indifference on that specific date. She contends the prosecutor misstated the law by suggesting that it was sufficient to base a conviction for homicide on manifestations of indifference toward Hana before the charging period began.

Carri relies on State v. Davenport, 100 Wn.2d 757, 675 P.2d 1213 (1984), for the proposition that the prosecutor's argument misled the jury and conflicted with the court's to-convict instruction. But Carri's reliance on Davenport is misplaced. There, the prosecutor, in closing argument, presented an alternate theory of liability, namely accomplice liability, that the State had not charged and for which the jury had not been instructed. Id. at 763.

This case is distinguishable. First, although the charging period was "on or about May 12, 2011," the statute and the first element in the to-convict instruction required evidence that Carri "acted under circumstances manifesting an indifference to human life." A "circumstance" is "a specific part, phase, or attribute of the surroundings or background of an event, fact, or thing or of the prevailing conditions in which it exists or takes place." WEBSTER'S NEW INTERNATIONAL DICTIONARY 410 (2002). To manifest means "to show plainly: make palpably

- 31 -

evident or certain by showing or displaying." WEBSTER'S NEW INTERNATIONAL DICTIONARY 1375 (2002). The background details of Carri's mistreatment of Hana before her death on May 12, 2011, are "circumstances" probative of Carri's attitude toward and treatment of Hana on the day of her death.

Second, the Legislature indicated a clear intent to make a person's pre-death conduct relevant by explicitly requiring the State to prove "a pattern or practice" of past torture or abuse. As the Russell court noted, in a homicide by abuse case, the statute's reference to a "pattern or practice" requires proof of "a series of assaultive acts—a continuing course of conduct—not a single incident." 69 Wn. App. at 249. We see nothing unfair for a prosecutor to argue that Carri's mistreatment of Hana on May 11 or 12, 2011—mistreatment that was consistent with her pattern or practice of past torture or abuse—demonstrated her extreme indifference to Hana's life. The prosecutor's argument that Carri exhibited extreme indifference to Hana for an extended period of time before Hana died was a reasonable one based on the language of these elements in the "to-convict" instruction. Unlike in Davenport, the prosecutor did not insert a new theory of liability into the case.

Moreover, in Larry's direct appeal, the court rejected the argument that only the conduct on May 12, 2011 was relevant:

> Contrary to Larry's argument, the "[o]n or about May 12, 2011" charging period for the manslaughter charge does not limit the charge only to events when Larry was not home on May 11 and 12, 2011. . . . "[W]here time is not a material element of the charged crime, the language 'on or about' is sufficient to admit proof of the act at any time within the statute of limitations, so long as there is no defense of alibi." Time is not a material element of first degree manslaughter. The conduct here also falls well within the statute of

limitations period, and Larry did not rely on a true alibi defense. The jury was not limited in determining Larry's guilt to the events that occurred while he was not home on May 11 and 12, 2011.

State v. Larry Paul Williams, No. 71112-1-I, slip op. at 11 (Wash. Ct. App. Dec. 21, 2015) (unpublished), review denied, 185 Wn.2d 1034, 377 P.3d 741 (2016).[18]

Carri has not demonstrated that the prosecutor's rebuttal statement regarding the duration of Carri's abuse of Hana was a misstatement of the law or "flagrant and ill-intentioned." We reject her prosecutorial misconduct claims.

## Claim 4: Ineffective Assistance of Counsel

Carri makes four new claims of ineffective assistance of counsel at trial and on direct appeal: that her trial counsel was ineffective (1) for failing to ask for a severance of the counts related to Hana from the count related to I.W. and (2) for failing to object to testimony related to a parenting book found in the Williamses' home; and that her appellate counsel was ineffective (3) for failing to assign error to the admission of testimony about the parenting book and (4) for failing to assign error to the trial court's failure to define "extreme indifference to human life." We address each claim in turn.

"To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different."

---

[18] http://www.courts.wa.gov/opinions/pdf/711121.pdf.

State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251, 1256 (1995). A claim of ineffective assistance of counsel presents a mixed question of law and fact which we review de novo. In re Pers. Restraint of Fleming, 142 Wn.2d 853, 865, 16 P.3d 610 (2001).

(a) Trial Counsel's Failure to File Pretrial Severance Motion

Carri argues trial counsel should have moved to sever the homicide by abuse and manslaughter charges relating to Hana's death from the first degree assault of a child charge related to I.W. Counsel submitted declarations in which they testified that they did not seek a severance because it did not occur to them to do so.

Separate trials are not favored in Washington. State v. Dent, 123 Wn.2d 467, 484, 869 P.2d 392 (1994). To demonstrate deficient performance, a defendant must show in the record the absence of a legitimate strategic or tactical reason supporting the challenged conduct by counsel. State v. Emery, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). To establish prejudice based on an improper joint trial, a defendant must show that a competent attorney would have moved for severance, that the motion likely would have been granted, and that there is a reasonable probability that the defendant would have been acquitted at a separate trial. Id. The failure to show either deficient performance or prejudice defeats a defendant's claim. Id.

We do not need to evaluate whether the failure to file a motion to sever was deficient because we conclude Carri cannot establish prejudice. Under CrR 4.3(a), the trial court has broad discretion to join offenses in one trial where the charged

- 34 -

offenses "(1) [a]re of the same or similar character, even if not part of a single scheme or plan; or (2) [a]re based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." State v. Bluford, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017). The defendant has the "burden of demonstrating that a trial involving both counts would be so manifestly prejudicial as to outweigh the concern for judicial economy." State v. Bythrow, 114 Wn.2d 713, 718, 790 P.2d 154 (1990). To determine whether joinder may be prejudicial, a court must consider "(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial." State v. Sutherby, 165 Wn.2d 870, 884-85, 204 P.3d 916 (2009) (quoting Russell, 125 Wn.2d at 63).

Carri relies on Sutherby to argue that it is "extremely likely" that the trial court would have granted a severance motion. That reliance is misplaced. In that case, the defendant was charged with first degree child rape and first degree child molestation involving the same child, and multiple counts of possession of child pornography. Sutherby, 165 Wn.2d at 874. The court held that the defendant's counsel was deficient in failing to move for a severance of the child rape/molestation charges from the pornography charges because there was no strategic or tactical advantage in having these charges tried together. Id. at 884.

The court also found prejudice because while the State's evidence related to the child pornography charges was strong, the evidence related to the molestation charges was weaker, as it relied on the testimony of a six-year-old girl.

- 35 -

Id. at 885. The defendant offered separate defenses for each charge and while the jury was instructed to consider each count separately, the State consistently argued that defendant's possession of child pornography proved he molested the child. Id. at 885. The court noted that in cases involving sex crimes, joinder can be "particularly prejudicial" despite proper jury instructions. Id. at 884.

Unlike in Sutherby, Carri has not demonstrated that it was likely the trial court would have granted a motion to sever the counts. First, we do not see a significant difference in the strength of the State's evidence relating to Hana's death and the strength of the evidence relating to the assault of I.W. The State's evidence relating to the abuse of I.W., unlike in Sutherby, was not based solely on I.W.'s testimony. There was objective, photographic evidence of I.W.'s scars, as well as the testimony from the Williamses' children attesting to the beatings, food deprivation, and social isolation that I.W. endured. Carri admitted using corporal punishment on I.W., including spanking him with switches, sometimes on the bottoms of I.W.'s feet, rendering it painful to walk. She admitted having directed her sons to spank I.W. as well. The evidence was consistent that I.W. was treated the same as Hana was—from having to eat wet sandwiches, to being beaten with a switch, to being locked overnight in a damp shower room.

Second, while Carri claims she had separate defenses related to each charge, the defenses were not inconsistent. The trial court gave Carri's requested jury instruction on lawful use of force by a parent. It instructed that "[t]he physical discipline of a child is lawful when it is reasonable and moderate, and is inflicted

- 36 -

by a parent for purposes of restraining or correcting the child." The defense of the lawful use of force thus applied to both counts.

In closing, as to the homicide by abuse charge, Carri argued the evidence demonstrated she did care what happened to Hana and was concerned about her well-being on May 11, 2012, that she did not cause Hana to die of hypothermia because she had not forced Hana to remain outside, and that the State had not proven that Hana was under the age of 16. As to the manslaughter charge, Carri argued that she had no reason to suspect Hana was at risk of dying from hypothermia and she did not disregard any risk of death because she urged Hana repeatedly to come indoors.

As to the assault charge, Carri contended that her physical discipline of I.W. did not cause him substantial bodily harm and any scars he had were there when he arrived from Ethiopia.

Severance is required only if a defendant "makes a convincing showing that she has important testimony to give concerning one count and a strong need to refrain from testifying about another." State v. Watkins, 53 Wn. App. 264, 270, 766 P.2d 484 (1989). None of Carri's defenses required her to admit an allegation as to I.W. that would have undermined a defense as to Hana, or vice versa. Carri actually admitted to the jury in closing that she was "guilty of many offenses for the abuse that she inflicted on these children," but she was not guilty of the charges the State chose to bring. Carri's defenses to the homicide counts and the assault charge were simply not antagonistic.

Third, the jury instructions properly told the jury to consider each count separately. Instruction 6 provided that a separate crime was charged in each count, that the jury had to decide each count separately, and a "verdict on one count as to one defendant should not control your verdict on any other count or as to the other defendant." We have evidence the jury understood and followed this instruction because it found Carri guilty of homicide by abuse but could not reach unanimity on that charge as to Larry.

Finally, Carri cannot demonstrate that the prejudice from a joint trial would have outweighed the concern for judicial economy.[19] "Defendants seeking severance must not only establish that prejudicial effects of joinder have been produced, but they must also demonstrate that a joint trial would be so prejudicial as to outweigh concern for judicial economy." Bythrow, 114 Wn.2d at 722. Our Supreme Court has held that severance is not required "in every case where the evidence of one count would not be admissible in a separate trial of the other counts." Id. (quoting State v. Gatalski, 40 Wn. App. 601, 609 n.6, 699 P.2d 804 (1985)).

A significant amount of evidence the State presented to establish the crimes against Hana was cross-admissible to establish the crime against I.W. The trial court instructed the jury on the manslaughter aggravator that the offense "was part of an ongoing pattern of psychological or physical or sexual abuse of the victim or multiple victims manifested by multiple incidents over a prolonged period of time."

---

[19] Judicial economy is defined as "Efficiency in the operation of the courts and the judicial system; esp., the efficient management of litigation so as to minimize duplication of effort and to avoid wasting the judiciary's time and resources." BLACK'S LAW DICTIONARY 1012 (11th ed. 2019).

All of the evidence of the pattern of physical abuse of I.W., the details of which were quite similar to that which Hana experienced, would have been admissible in any trial of the manslaughter charge to establish this aggravating factor.

Similarly, the assault of a child charge required evidence of a "pattern or practice" of either assaulting I.W. and "causing bodily harm that was greater than transient physical pain or minor temporary marks," or causing I.W. "physical pain or agony that was equivalent to that produced by torture." Carri's mistreatment of Hana—both the physical abuse and the food deprivation—would have been probative of Carri's disciplinary practices that went to the heart of the State's assault case.

The concerns for judicial economy would have been significant. The trial lasted seven weeks, and involved the testimony of 54 witnesses, most of whom would have had to testify in both trials, had the trials been severed. The sheer length and complexity of the trial would have weighed against severance. In addition, I.W., who is deaf, required the assistance of two American Sign Language interpreters to testify. And he and four of the children who testified were minors at the time. Requiring these witnesses to provide the same evidence twice would also have given the trial court significant reason not to sever the charges.

We conclude Carri has not established that it was likely that the trial court would have granted a defense motion to sever the charges in this case. For this

reason, she has not proven she was prejudiced by her counsel's failure to make this motion.[20]

(b) Trial Counsel's Failure to Object to Testimony about the Book, To Train Up a Child and Appellate Counsel's Failure to Raise the Issue on Appeal

Carri contends trial counsel provided ineffective assistance of counsel by failing to object to questions regarding disciplinary practices recommended in the book, To Train Up a Child.[21] Carri asserts this book is a "controversial" parenting book and that introduction of testimony about it violated her First Amendment rights. We disagree that trial counsel's failure to object to testimony about this book was deficient performance or that its admission prejudiced Carri.

While executing a search warrant on the Williamses home on August 24, 2011, law enforcement seized a parenting book entitled To Train Up a Child. During the direct examination of Carri's third eldest son, the prosecutor asked if he was familiar with this book. He testified he understood that the book was about "how to raise up children."

When Carri took the stand, the State questioned her about the book as well. The State had good reason to do so. Carri admitted that the phrase "train up a child" appeared on a sign taped to a wall in her home:

Q. (By Ms. Kaholokula) Exhibit 437, I believe. And does that look like a picture of Hana from that same time frame as the Christmas that we've been talking about, December of 2009?

A. This is right before Christmas.

. . .

---

[20] Because we conclude that there is a strong probability that the trial court would have denied any severance motion, we similarly deny Carri's request for a reference hearing related to the issue of severance.

[21] MICHAEL AND DEBI PEARL, TO TRAIN UP A CHILD (1994).

Q. And on the – to my right, on the picture, there's a sign there that – that's got a quote?

A. Yes.

Q. Training –
A. It's a Scripture verse –

Q. – the child and the way it should go?

A. – from the Bible.

Q. You [sic] have to let me finish asking the question. So this quote, train up a child, is pasted or taped on the wall of your home; correct?

A. That's not the wall of my home.

Q. Closet?

A. That's not even a closet.

Q. Okay. What is it?

A. It's where we put our television.

Q. Okay. Whatever it is, it's taped up in your house; right?

A. That's correct.

Q. And it happens to be the same name as the title of the book that we're talking about yesterday, *Train Up a Child*; right?

A. Yeah, coincidentally.

RP (8/30/13) 70-72.

Carri also testified that she read this book and followed some of its advice. For example, she got the idea of using a plumbing rod as a switch for spanking from the book. Carri also admitted that the book advocated "rinsing off" children for potty training and that influenced their decision to hose down I.W. outside when he wet his pants. Carri further admitted that the book informs readers that

- 41 -

spanking should cause pain and fear. Carri insisted she disagreed with this passage in the book, but Jacob testified he understood that the punishment his parents and he inflicted was intended to inflict pain. The State marked the book as Exhibit 436 but did not offer it into evidence.

First, Carri's adherence to techniques recommended by To Train Up a Child was highly probative of whether Carri's disciplinary practices were "reasonable and moderate," as Carri asserted, or whether her conduct rose to the level of torture, an element of both homicide by abuse and assault of a child. A reasonable jury could conclude that Carri and Larry selected unreasonable disciplinary techniques recommended in this book and believed they needed to exact pain for the discipline to be effective.

Second, Carri's reliance on United States v. Waters, 627 F.3d 345 (9th Cir. 2010) is misplaced. In that case, the defendant was convicted of arson after setting fire to buildings on the University of Washington campus to protest genetic engineering. Id. at 348. The Ninth Circuit reversed, concluding the district court erroneously admitted "anarchist literature" at trial without reading the literature to determine if it was probative. Id. at 357. In this case, the State did not offer and the trial court did not admit the book into evidence. Additionally, the probative value of the limited questions the State posed about the contents of the book is evident from the crimes charged, the defenses raised, and the instructions given. Waters is distinguishable on these bases.

Similarly, State v. Coe, 101 Wn.2d 772, 684 P.2d 668 (1984), and State v. Hanson, 46 Wn. App. 656, 731 P.2d 1140 (1987), are inapplicable. Coe involved

the defendant's own writings about masturbation, writings the court held to have no probative value and to be inflammatory in the defendant's rape trial. 101 Wn.2d at 779-80. Hanson involved evidence of the defendant's crime fiction introduced during his trial for assault. 46 Wn. App. at 662-63. The court held that the evidence, which involved stories of violence, was offered solely to show the defendant's propensity for violence, was inadmissible for that purpose, and was highly prejudicial. Id.

Coe and Hanson are distinguishable because in both cases, the State sought to introduce something the defendant had written as character evidence to show a propensity for committing the charged crimes. In this case, neither Larry nor Carri authored To Train Up a Child. The State was not offering the evidence to establish their propensity to commit child abuse or torture. Instead, it sought to establish that they intentionally chose disciplinary techniques for the purpose of inflicting pain on Hana and I.W. The fact that they adopted techniques recommended to cause such pain made their reading of this book highly probative of their intent when disciplining Hana and I.W.

Furthermore, on cross-examination, Carri was asked minimal questions about the book. She repeatedly stated that she did not follow the book "as though it was the Bible" and had not read it in 10-15 years. Larry was never asked about the book or its contents; he testified that the idea of using the switch came from "a book" but did not specify which book.

Because the State did not offer, and the trial court did not admit, the book itself into evidence and because the testimony about the book was probative as to

the purpose behind Carri's chosen disciplinary techniques for Hana and I.W., trial counsel was not deficient in failing to object to this evidence and appellate counsel was not ineffective for failing to assign error to the admission of this evidence.

(c) <u>Appellate Counsel's Failure to Assign Error to Lack of Definition of "Extreme Indifference to Human Life"</u>

Finally, Carri contends that her appellate counsel was ineffective for failing to assign error to the trial court's rejection of the defense's proposed instruction defining "extreme indifference to human life." As previously stated, the trial court's rejection of Carri's proposed instruction was not error under both <u>State v. Barstad</u> and this court's decision in Carri's direct appeal. Thus, Carri's appellate counsel was not ineffective.

Because neither Carri's trial counsel nor her appellate counsel were ineffective, we reject Carri's Claim 4.

## CONCLUSION

Based on our review of Carri's personal restraint petition and the trial record, we conclude there were no constitutional errors giving rise to any actual prejudice and no fundamental defects resulting in a complete miscarriage of justice. Carri received a fair trial. We thus deny her personal restraint petition.

WE CONCUR:

Andrus, J.

Dwyer, J.

Leinweber, J.